# In the United States Court of Federal Claims

No. 24-1165C
(Filed Under Seal:  November 4, 2024)
(Reissued: November 19, 2024)[1]

```
*************************************
                                    *
ZIN TECHNOLOGIES, INC.,             *
                                    *
                  Plaintiff,        *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
                  Defendant,        *
                                    *
And                                 *
                                    *
SIERRA LOBO, INC.,                  *
                                    *
                  Defendant-Intervenor. *
*************************************
```

Jeffery M. Chiow, Washington, D.C., for Plaintiff, with whom was Eleanor M. Ross, Tim M. McLister, and Christopher M. O'Brien, of counsel.

David M. Kerr, Senior Trial Counsel, United States Department of Justice, Civil Division, with whom were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Corinne A. Niosi, Assistant Director, for the Government.  Stephen T. O'Neil, and Macallister A. West, National Aeronautics and Space Administration, of counsel.

Douglas Paul Hibshman, Washington, D.C., for Intervenor, with whom was Keeley A. McCarty, Dana L. Molinari, and Jung Hyoun Han, of counsel.

---

[1]  The Court issued this opinion under seal on November 4, 2024, and the Court gave the parties fourteen days to propose the redaction of competition-sensitive, proprietary, confidential, or otherwise protected information. The Government and Intervenor filed their respective proposed redactions, and Plaintiff did not file any proposed redactions.  Plaintiff indicated to the Court that it does not oppose the Government's and Intervenor's proposed redactions.  Thus, the Court adopts the parties' redactions and issues the redacted opinion unsealed.  Redactions are indicated with "██████."

**OPINION AND ORDER**

Damich, *Judge.*

In this post-award bid protest, ZIN Technologies, Inc. ("ZIN Tech"), the incumbent contractor, challenges the U.S. National Aeronautics and Space Administration's ("NASA" or the "Agency") award of Request for Proposals No. 80GRC022R0016 (the "Solicitation") to Sierra Lobo, Inc. ("SLI"). ZIN Tech alleges that NASA failed to apply the Solicitation's stated evaluation criteria consistently to ZIN Tech and SLI, resulting in an arbitrary decision to award the contract to SLI and not to ZIN Tech. Further, ZIN Tech argues that the award is tainted by an unmitigated organizational conflict of interest ("OCI") created by SLI's major subcontractor Leidos.

ZIN Tech filed a Motion for Judgment on the Administrative Record on August 27, 2024. ZIN Tech seeks a permanent injunction preventing NASA from proceeding with the contract award and asks the Court to set aside NASA's award. The Government filed its Response and Cross-Motion for Judgment on the Administrative Record. The Motions are fully briefed.

On September 18, 2024, ZIN Tech filed an unopposed Motion for Leave to Supplement the Complaint. ECF No. 33. In the Motion, ZIN Tech states, "The U.S. Small Business Administration ("SBA") Office of Hearings and Appeals ("OHA") issued a decision during the pendency of this protest, concerning a Size Determination of Defendant-Intervenor, Sierra Lobo." ECF No. 33 at 1. ZIN Tech further explains in its Motion that the size determination was issued in connection with the same procurement at issue in this protest. ECF No. 33 at 1. The Court granted ZIN Tech's Motion and adopted the proposed supplemental briefing schedule for the size protest issue. ECF No. 34.

ZIN Tech filed a Motion for Judgment on the Administrative Record concerning its Size Protest and Appeal. In its Motion, ZIN Tech argues that the OHA's conclusion that SLI is an eligible small business was arbitrary, capricious, unreasonable, and the product of clear legal error. ZIN Tech seeks a permanent injunction preventing NASA from proceeding with the contract award until a proper determination of SLI's small business status is complete, and ZIN Tech asks the Court to set aside NASA's award. The Government and Intervenor filed their respective Cross-Motions. The Motions are fully briefed.

Oral argument is unnecessary. Because both NASA and the OHA properly documented their decisions and their analysis is reasonable, the Government's and Intervenor's Motions for Judgment on the Administrative Record are **GRANTED** and ZIN Tech's Motions are **DENIED**.

**BACKGROUND[2]**

---

[2] The facts in the background are derived from the administrative record ("AR"), which includes Tabs 1-69 filed on August 13, 2024, and Tabs 70-91 filed on October 2, 2024. ECF No. 26, 44.

## I.    The Solicitation

On March 16, 2023, NASA issued a Solicitation which contemplated the award of an Indefinite Delivery, Indefinite Quantity ("IDIQ") contract, called SpaceDOC III, to support the Glenn Research Center ("GRC") at NASA.  AR 1773.  The GRC has responsibility for space flight development and support for several space-related programs.[3]  AR 3096.  The Solicitation seeks a contractor to assist with the development and delivery of technology, space flight hardware and software, ground support equipment and spaces, mission integration and operations, and sustaining engineering.  AR 3099, 2930.

The Solicitation provided for a 100% small business set-aside and a North American Industry Classification System ("NAICS") code 541715[4] with a size standard of 1,000 employees.  AR 13148.  The Solicitation instructs that SpaceDOC III will be a single-award IDIQ contract with a three-year Base Period, two two-year Option Periods, and one 6-month Optional Extension.  AR 2937.  The Base Period is broken down into multiple project-specific Base Orders and IDIQ Delivery Orders, with requirements and associated schedules for each project established in each respective Base/Delivery Order.  AR 2925-27, 2930, 3096-98, 3106.

The Solicitation states that the contractor will be required to support the definition, design, development, analysis, fabrication, assembly, testing, verification, delivery and/or operation of space flight systems, associated support systems and equipment, and related ground development activities, that include research and technology developments and demonstrations. AR 3099.  The Solicitation further instructs that work will generally be performed at the contractor's facility.  *Id*.

## II.    The Solicitation's Evaluation Factors

The Solicitation states that it will be evaluated in accordance with FAR Part 15.  The Solicitation further states that Offerors will be evaluated based upon three evaluation criteria: (1) Mission Suitability; (2) Cost/Price; and (3) Relevant Experience and Past Performance.  AR 3078-79.  To complete the evaluation, NASA established four committees to evaluate the various factors and subfactors and to assist the Source Selection Evaluation Board ("SSEB").  AR 5-6. The SSEB presents its findings to the Source Selection Authority ("SSA"), who then selects the responsible offeror whose proposal provides the best value to the Government.  AR 5, 3079.

---

[3] The GRC has "space flight development responsibility that range from the Space Launch System (SLS) Program, Orion service module, Gateway, numerous microgravity research investigations on International Space Station (ISS) and launch vehicles, ISS power system, electric propulsion systems, human research projects, space flight technology developments and demonstrations of advanced power, propulsion, communications and other systems, and the potential for space science instrumentation packages."  AR 3096.

[4] Code 541715 refers to Research and Development in the Physical, Engineering and Life Sciences—except Nanotechnology and Biotechnology.  AR 13148.

### A. Mission Suitability

The first evaluation factor, Mission Suitability indicates "the quality of the work to be performed, the ability of the Offeror to accomplish what is offered, and the services to be provided." AR 3079. Within this factor, NASA will evaluate the offeror's approach to the technical requirements, including four representative base order hypotheticals, and the proposed Management Plan and approach to program management, staffing, and risk management. AR 3081-88.

The Mission Suitability Factor is composed of three subfactors: (a) Understanding Technical Requirements; (b) Coordination between Government, Contractor, and Principal Investigators ("PIs"); and (c) Understanding the Approach to Meeting the Technical and Engineering Requirements. AR 3080. The Solicitation instructs that each subfactor is to be numerically scored and assigned an adjectival rating based on the numerical scores. The proposals are then given one of the following ratings, which are defined in FAR 15.001, to classify the evaluation findings under each Mission Suitability subfactor: "Significant Strength," "Strength," "Weakness," "Significant Weakness," or "Deficiency." AR 3080.

### B. Cost/Price

For the second evaluation factor, Cost/Price, Solicitation provides that "the proposal analysis techniques under FAR 15.404 and NFS 1815.404 will be considered to determine a fair and reasonable price." AR 3088. Further, NASA will conduct a cost realism analysis to "ensure a realistic cost is determined and considered by the Government." *Id.*

### C. Past Performance

With respect to past performance, the Solicitation advises that NASA will evaluate "three (3) areas of relevant experience and past performance of the Offeror and any Major Subcontractors/Teaming Partners: (1) Past Performance Narrative (PPN); (2) Past Performance Questionnaires (PPQ); and (3) Past Performance Databases (PPD)." AR 3089.

Past performance must be relevant, which means completed within the past five years and similar in scope, complexity, size, type, length, customer, and considering whether performance was completed as a prime or subcontractor. *Id.* Subcontractor experience "will only be deemed relevant if the past performance information is deemed relevant to the work they are assigned in the Offerors' (and/or Major Subcontractor's) proposal." *Id.*

Finally, NASA will assign a Confidence Rating "based on the quality of each instance of relevant past performance as well as the applicability of this experience to the requirements of Attachment J.1-A – Statement of Work and this solicitation." AR 3090-91.

### D. Relative Weight of the Evaluation Factors

The Solicitation states that "As individual factors, the Mission Suitability Factor is more important than the Cost/Price Factor, which is more important than the Relevant Experience and

Past Performance Factor.  When combined, Mission Suitability and Relevant Experience and Past Performance are significantly more important than the Cost/Price Factor alone."  AR 3092.

## III.    Discussions

Both SLI and ZIN Tech timely submitted their initial proposals.  After evaluating the offerors' initial proposals, NASA opened discussions with SLI and ZIN Tech on September 1, 2023.  *See generally*, AR 5108-94.  During its discussions with both offerors, NASA identified weaknesses, questions, and issues in each offeror's proposal.  NASA stated in its letter to each offeror that, "this information is provided during the discussion phase with the intent of allowing you the opportunity to revise your proposal after the conclusion of the discussions."  AR 5108, 5155.  After discussions were conducted, NASA allowed offerors to submit a Final Proposal Revision ("FPR") to correct any weaknesses identified during discussions.

During its discussions with SLI, NASA identified five weaknesses and one significant weakness under the first factor, Mission Suitability.  AR 5110-12.  Under the second factor, Cost/Price, NASA determined that a portion of SLI's Major Subcontractor's, Leidos, proposed direct labor rates appeared low.  AR 5113.  Under the third factor, Past Performance NASA identified no adverse past performance but noted that SLI's "proposal did not clearly identify what specific roles your Major Subcontractor [Leidos] would perform on the contract so it was difficult for the Government to determine whether the relevant examples provided were representative of the actual work they would perform."  *Id.*

During its discussions with ZIN Tech, NASA identified four weaknesses and one significant weakness under the Mission Suitability Factor.  AR 5157-59.  With respect to ZIN Tech's Past Performance Factor, NASA noted that it had discovered adverse performance information "outside the existing [Contractor Performance Assessment Reporting System ("CPARS")] reports," and provided ZIN Tech an opportunity to respond to that information.  AR 5160.  The adverse information included ZIN Tech's problems with cost overruns and scheduling, among other concerns.  AR 5160.

On September 22, 2023, offerors were notified that FPRs were due by October 6, 2023.  AR 5185, 5187, 5141, 5144.

## IV.    Evaluation, Award, and Debriefing

Following discussions, both SLI and ZIN Tech SLI timely submitted their FPRs on October 6, 2023.  AR 5195-6018, 6019-7234.

### A.  NASA's Evaluation of SLI's Proposal

NASA summarized its evaluation of SLI's FPR as follows:

| Sierra Lobo, Inc. | | |
|---|---|---|
| **Mission Suitability** | **Mission Suitability Score** | **878/1000** |
| | Understanding Technical Requirements  (400 points) | Excellent |
| | Product Assurance (200 points) | Good |
| | Management Plan and Approach (400 points) | Excellent |
| **Cost/Price** | **Proposed/Probable Cost/Price** | **$282,159,744** |
| **Relevant Experience & Past Performance** | **Level of Confidence** | **Very High Level of Confidence** |

AR 8915.  For the Mission Suitability Factor, SLI identified ten key personnel and positions descriptions that SLI planned to use in its performance approach.[5]  AR 5571-82.  SLI also provided additional detail regarding the role of its subcontractor, Leidos.  AR 5492.

For the Cost/Price Factor, SLI's proposed price of $282,159,744 is the 2nd lowest of the Offerors within the competitive range and substantially below the IGCE.  AR 8885.  The SSEB did not identify any cost risks in the FPR.  *Id.*

For the Past Performance Factor, SLI submitted 5 contracts for consideration: (1) Environmental Test and Integration Services ("ETIS II"); (2) Multi-Divisional Engineering Design, Analysis Lab- Wide Support ("MEDALS"); (3) Omnibus Multidiscipline Engineering Services ("OMES II"); (4) Cargo Mission Contract 3 ("CMC3"); and (5) Research, Engineering and Mission Integrations Services ("REMIS").  AR 3723-47.  NASA also identified a sixth contract in CPARS.  AR 8494, 8885-86.  NASA concluded that all of SLI's contracts were "relevant" and "highly pertinent."  AR 8885-86, 8497-8504.  For each Past Performance example, SLI disclosed its cost overruns and the action it took to correct those overruns in accordance with the Solicitation requirements.  *See* AR 3728 (ETIS II), 3733 (MEDALS), 3737 (OMES II), 3742 (CMC3), 3746 (REMIS).

Both offerors submitted an OCI Assessment and an OCI plan with specific mitigations in their FPRs.  *Id.*  SLI's OCI Assessment disclosed Leidos' NASA contract for the Orion Laser Air Monitor System ("LAMS"), among other LAMS work, and stated that there is no OCI anticipated in relation to the SpaceDOC III contract:

> Prior to including ███████ in its proposal, SLI obtained a letter of commitment from ██████. That letter was not submitted to NASA with SLI's proposal because the Solicitation did not require letters of commitment, and thus it is not part

---

[5] This includes four identified key personnel and six position descriptions.  SLI proposed ████████ as its Deputy Program Manager, noting that he has over twenty years of experience with NASA GRC space flight development programs.  AR 5496.  SLI included a one-page resume for ████████ as required by the Solicitation.  AR 5572.  The resume showed that ████████ was currently the Director of Engineering for ZIN Tech.  AR 5572.

of the Administrative Record, but the letter of commitment demonstrated ███████
███████ intent to accept employment with SLI as the Deputy Program Manager in
the event that SLI was designated as the awardee.

AR 3441, 3437, 3440.

## B. NASA's Evaluation of ZIN Zech's Proposal

NASA summarized its evaluation of ZIN Tech's FPR as follows:

| ZIN Technologies, Inc. | | |
|---|---|---|
| **Mission Suitability** | **Mission Suitability Score** | **842/1000** |
| | Understanding Technical Requirements (400 points) | Very Good |
| | Product Assurance (200 points) | Good |
| | Management Plan and Approach (400 points) | Very Good |
| **Cost/Price** | **Proposed/Probable Cost/Price** | ████████ |
| **Relevant Experience & Past Performance** | **Level of Confidence** | **Moderate Level of Confidence** |

AR 8962.  For the Mission Suitability Factor, NASA assigned ZIN Tech's proposal 2
significant strengths, 11 strengths, and 3 weaknesses (AR 8886-89).  For the Cost/Price Factor,
ZIN Tech's total proposed cost/price is approximately ████████ lower than SLI's.  AR 8962,
8915.

For the Past Performance Factor, ZIN Tech submitted 4 contracts including the
incumbent contract, and NASA identified a fifth contract from ZIN Tech's CPARS.  AR 8889,
8510.  NASA found all five of ZIN Tech's contracts to be relevant and "very highly pertinent to
the SpaceDOC III requirements."  *Id.*  The PPQ evaluation revealed "mostly Satisfactory and
Very Good ratings[.]"  *Id.*  For the PPD evaluation, "ZIN received mostly Satisfactory and Very
Good ratings" and "a small percentage of Exceptional" and fewer "Marginal ratings."  *Id.*
Overall, ZIN Tech "demonstrated effective performance; fully responsive to contract
requirements; reportable problems, but with little identifiable effect on overall performance."  *Id.*

## C. Conclusion of NASA's Evaluation and Award Decision

NASA performed an OCI review and analysis during its evaluation of proposals.  AR
8396-418.  NASA reviewed the OCI Plan that SLI submitted with its proposal, and NASA
performed its own independent review of potential OCIs arising from other contracts held by SLI
and its subcontractors.  AR 8396-418.  NASA specifically evaluated potential OCIs presented by
SLI's major subcontractor, Leidos, due to Leidos' role on other NASA projects.[6]  With respect to
the LAMS Contract, NASA determined that there is no risk of an unfair competitive advantage

---

[6] NASA considered Leidos' role on the Safety, Health, and Mission Assurance
("SHeMA-2") Contract and found that there is no actual or apparent OCI.  AR 8401.

to SLI, and that no OCI exists on any other basis.  AR 8412.  NASA found that neither offeror presented an OCI with respect to the SpaceDOC III contract.  AR 8852.

Next, NASA determined that both SLI and ZIN Tech had relevant and very highly pertinent past performance examples.  AR 8886, 8889.  However, SLI's PPQs and PPDs were predominantly rated Exceptional and Very Good, while ZIN Tech's PPQs and PPDs were predominantly Satisfactory and Very Good.  AR 8886, 8889.  ZIN Tech's PPDs also included some Marginal ratings.  AR 8889.  In reviewing SLI's Past Performance, NASA could not obtain a PPQ or PPD for the OMES II contract, so it treated OMES II neutrally in its overall Confidence Rating.  AR 8647-48.

In reviewing ZIN Tech's Past Performance, NASA identified concerns regarding cost overruns, cost estimating, and scheduling that were not resolved through discussions, even after providing ZIN Tech the opportunity to address them:

> Projects are having issues with cost overruns and the Government has received multiple cost overrun proposals in the last six months.  The board thoroughly reviewed and considered the information provided. Ultimately, the response did not address what corrective action would be taken to alleviate the risk of cost overruns continuing to occur in the future.

AR 8655.  Ultimately, NASA found that while ZIN Tech's proposed Price is nominally lower than SLI's proposed Price, SLI received higher Mission Suitability and Past Performance ratings:

**Evaluation Results – Final Proposals**

Below is a summary of the final evaluation results of each Offeror in the competitive range:

| Offeror Name | Mission Suitability | Proposed Cost | Probable Cost* | Level of Confidence Rating |
|---|---|---|---|---|
| Sierra Lobo, Inc. | 878 | 2nd Lowest | 2nd Lowest | Very High |
| ZIN Technologies, Inc | 842 | Lowest | Lowest | Moderate |

*There were no probable cost adjustments necessary for either Offeror.  Final proposed cost equaled Probable cost.

AR 8883.  NASA's Source Selection Authority determined that SLI presented the best value to the government:

> When SLI's distinct technical advantage is combined with the significant advantage that SLI's proposal also presents in the Relevant Experience and Past Performance Factor, the qualitative superiority of SLI's proposal substantially outweighs the relatively modest cost savings that ZIN's proposal presents.

AR 8895.  Thus, NASA awarded the Contract to SLI on February 22, 2024.  AR 8997.  NASA notified ZIN Tech on February 22, 2024, that it had not been selected for award.  AR 8899.  On March 1, 2024, NASA provided ZIN Tech with a post award debriefing.  *See generally* AR 8949-96.

## V.    Procedural History

### A.  ZIN Tech's GAO Protest

On March 6, 2024, ZIN Tech filed a timely protest with the Government Accountability Office ("GAO").  At the GAO, ZIN Tech argued that Leidos' LAMS project created a significant potential impaired objectivity OCI.  AR 11810-12.  Specifically, ZIN Tech argued that Leidos' role as a major subcontractor on the SpaceDOC III contract places it in a position to define, test, analyze, and verify the operation and quality of the same LAMS equipment it is currently producing under the NASA Universal Stage Adapter contract.  AR 11812.

Further, ZIN Tech argued that NASA's assessment of weaknesses to the Mission Suitability Factor of ZIN Tech's proposal is flawed because the assessed weaknesses are contradicted by ZIN Tech's proposal and some of the weaknesses were merely "typographical" in nature.  AR 11798-11803.  ZIN Tech also contended that NASA's evaluation of ZIN Tech's Past Performance Factor is unreasonable, inconsistent with the evaluation criteria and the evaluation record, and disparate.  AR 11803-11810.  Finally, ZIN Tech argued that NASA's discussions were unequal because NASA failed to address certain concerns it had with ZIN Tech's proposal during discussions but raised concerns it had with SLI's proposal during discussions.  AR 11814-21.

### B.  NASA's OCI Investigation

In response to ZIN Tech's GAO protest, on April 29, 2024, the contracting officer completed an OCI investigation and issued a memorandum.  AR 12148. The contracting officer's investigation included reviews of both the SpaceDOC III and LAMS contracts, as well as consultations with the SpaceDOC III contracting officer's representative, the SpaceDOC II contracting officer's representative, the SpaceDOC II and III alternate contracting officer's representative, the LAMS contracting officer, and the LAMS contracting officer's representative.  AR 12144, 12309-12310.   Overall, the contracting officer determined that no OCI existed that would preclude award of the SpaceDOC III contract to SLI.  AR 12148.

### C.  The GAO's Denial of ZIN Tech's Protest

On June 13, 2024, the GAO denied ZIN Tech's protest.  *See* AR 12312.  The GAO rejected ZIN Tech's contention that NASA failed to mitigate an OCI with respect to the awardee's major subcontractor, Leidos.  AR 12289-12312.  The GAO explained, "The protester's vague and conclusory responses are insufficient to demonstrate that an impaired objectivity OCI exists or has the potential to exist due to Leidos's work on the LAMS contract." *ZIN Tech Inc.*, B-422405, B-422405.2 (Comp. Gen. July 13, 2024); AR 1478-79.

After reviewing the protested weaknesses assessed to ZIN Tech's proposal, the GAO found that NASA followed the instructions detailed in the Solicitation and reasonably determined to assess those weaknesses to ZIN Tech's proposal. Further, the GAO found that "while the protester contends these errors were just typographical, we find that the agency reasonably concluded that the lack of clarity with regard to the protester's understanding of risk level may indicate a lack of understanding." AR 12296. Additionally, the GAO found that NASA's evaluation of the Past Performance Factor reasonable, consistent with the Solicitation, and adequately documented. AR 12305.

Finally, the GAO also rejected ZIN Tech's allegations of unequal discussions. AR 1229-12300. The GAO did not accept ZIN Tech's argument that simply because SLI "received an extra page of discussions points or more slides in a slide presentation, this meant that discussions were unequal." AR 12300. Similarly, the GAO rejected ZIN Tech's argument that discussions were unequal solely because SLI "was able to improve its technical ratings more than the protester was able." *Id.* The GAO stated that pursuant to the Federal Acquisition Regulation ("FAR") 15.306(d), "discussions should be tailored to each offeror's proposal." *Id.* Because the GAO found that NASA described in detail its process for conducting discussions, including giving both offerors a discussions letter and a 2-hour in-person briefing regarding the points raised, discussions were conducted equally. *Id.*

### D.  ZIN Tech's Small Business Protest and OHA Appeal

After offerors were notified that SLI had been selected for award, ZIN Tech filed a size protest with the SBA's Area Office alleging that SLI was affiliated with HX5 Sierra LLC (HX5 Sierra) and National Aerospace Solutions, LLC (NAS), and thus each of the employees from HX5 Sierra and NAS should be included in ZIN Tech's employee count. AR 12315-17. ZIN Tech asserts that SLI's LinkedIn profile states that it has over 800 employees, that HX5 Sierra has more than 350 employees, and NAS has 1,802 "team members." AR 12315. ZIN Tech argues that these employees should be included in SLI's count. AR 12315-16. ZIN Tech asserts if these employees are aggregated to SLI's total employee count, then SLI will not be considered an eligible small business, as its employee count would exceed the 1,000-employee size standard. AR 12316.

In conducting a general affiliation analysis between SLI and HX5 Sierra and NAS, [7] the Area Office found HX5 Sierra is affiliated with SLI and that SLI was not affiliated with NAS. AR 12703. The Area Office then aggregated the number of employees for SLI and its affiliate, HX5 Sierra, and concluded that SLI is a small business as its size does not exceed the 1,000-employee size standard. AR 12703-07.

ZIN Tech then appealed the size determination with the OHA. AR 12971-72. The OHA affirmed the size determination and found that SLI is not affiliated with NAS or HX5 Sierra, as HX5 Sierra and NAS are valid joint ventures of which SLI is a minority member. AR 13085-86. The OHA applied 13 C.F.R. § 121.103(h) to calculate SLI's size using its proportionate share of

---

[7] A populated joint venture is "where work is performed by the joint venture entity itself and not by the individual joint venture partners." 13 C.F.R. § 121.103(h)(4)(2024).

employees from each joint venture and found that the proportionate share did not exceed the 1,000-employee size standard, and thus SLI is an eligible small business for the subject procurement. AR 13085-86. The appeal was subsequently dismissed. AR 13085-86.

## DISCUSSION

ZIN Tech brings five challenges: (1) NASA ignored SLI's significant and unmitigated impaired objectivity OCI; (2) NASA's Factor 1 evaluation of key personnel was flawed, and the resulting rating was unreasonable; (3) NASA's Factor 3 evaluation failed to follow the Solicitation's instructions and failed to treat offerors' proposals equally; (4) NASA disparately treated SLI with respect to cost overruns; and (5) the OHA acted arbitrarily and capriciously when it disregarded relevant evidence in the record.

ZIN Tech seeks permanent injunctive relief to enjoin NASA from continuing its award to SLI. When considering whether to grant a permanent injunction, the court must consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Although an award of injunctive relief is based on consideration of this four-factor test, failure to achieve success on the merits is dispositive. *See Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018) (holding that "proving success on the merits is a necessary element for a permanent injunction"). For the reasons below, the Court finds that all five of ZIN Tech's challenges lack merit. The Court considers each in turn.

Our review is deferential in accordance with the standard set forth in the Administrative Procedures Act, 5 U.S.C. § 706, which is to say that we review agency action in a procurement for illegality and a lack of rationality. *Impressa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001). So long as the agency's decision was not irrational or otherwise illegal, we will leave it undisturbed.

This Court decides a motion for judgment upon the administrative record pursuant to RCFC 52.1. The Court determines whether "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005). "[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record." *Id*. at 1356.

## I.   NASA Considered and Investigated Whether SLI's Proposal Contains an OCI and Reasonably Found that No OCI Exists.

ZIN Tech argues that SLI has an unmitigable OCI because its subcontractor, Leidos, also works on the NASA Laser Air Monitoring System ("LAMS") contract, which is a contract focusing on the production of systems that monitor the air quality, temperature, and pressure on the Orion spacecraft for use on the Artemis missions. ECF No. 28 at 2, 24, AR 12143. ZIN

Tech asserts that as the major subcontractor under the SpaceDOC III contract,[8] Leidos will be responsible for the testing, verification and operation of space systems and subsystems like the LAMS system, which is being developed and built by Leidos under the LAMS contract.  ECF No. 28 at 2.

An 'impaired objectivity' OCI 'occurs when a government contractor has conflicting obligations under different government contracts, that compromises the contractor's ability to render impartial judgment." *Sigmatech, Inc. v. United States*, 144 Fed. Cl. 159, 181 (2019) (quoting *Axiom Res. Mgmt., Inc. v. United States*, 78 Fed. Cl. 576, 592 n.17 (2007)).  "[T]he 'primary concern' of an impaired objectivity OCI is that 'a firm might not be able to render 'impartial advice.'"  *Id.* (quoting *Turner Const. Co. v. United States*, 94 Fed. Cl. 561, 569 (2010)).

The issue before this Court is whether an OCI is so prevalent that it gave an advantage to one bidder over the other, and whether the contracting officer failed to use appropriate discretion and to follow the required procedures in determining that no OCI exists.  *See PAI Corp. v. United States*, 614 F.3d 1347, 1351-1352 (Fed. Cir. 2010).  The Court "will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law."  *Id.* at 1352.  "To demonstrate that such a determination is arbitrary or capricious, a protestor must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough."  *Id.*  (quoting *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

Here, the record reflects that NASA followed the FAR requirements and thoroughly reviewed any potential OCIs arising from SLI's proposal during its initial evaluation[9] and then

---

[8] The performance tasks of SpaceDoc III, the contract at issue in this case, include "test, verification, delivery, and/or operation of space flight systems [and] associated support systems." AR 3099.

[9] Both offerors submitted a an OCI Assessment and an OCI plan with specific mitigations.  *Id.*  SLI's OCI Assessment disclosed Leidos' NASA contract for the Orion Laser Air Monitor System ("LAMS"), among other LAMS work, and stated that there is no OCI anticipated in relation to the SpaceDOC III contract.  AR 3441, AR 3437, 3440.  SLI provided the following information regarding the ongoing LAMS contract:

> Laser Air Monitor System to measure oxygen, carbon dioxide, water vapor, temperature, and pressure accurately enough to detect unsafe levels of these elements within the Orion spacecraft in time to allow the crew to respond to the fast changes in air composition in the Orion cabin.

> Unequal/Unfair Access to Information and Data: None. Impaired Objectivity: None.  Biased Ground Rules: None.  Findings: None. Mitigation Approach: None

AR 3440-41.  NASA performed its initial OCI review and analysis during its evaluation of proposals.  AR 8396-418.  NASA reviewed the OCI Plan that SLI submitted with its proposal, and NASA performed its own independent review of potential OCIs arising from other contracts

again during its OCI investigation following ZIN Tech's GAO bid protest. *See* FAR § 9.504(a)(1), § 9.506(a), (b).

During its initial evaluation, the record reflects that NASA reviewed the OCI Plan that SLI submitted with its proposal, and NASA performed its own independent review of potential OCIs arising from other contracts held by SLI and its subcontractors. AR 8396-8418. NASA specifically evaluated potential OCIs presented by SLI's major subcontractor, Leidos, due to Leidos' role on other NASA projects.[10] With respect to the LAMS Contract, NASA determined that there was no risk of an unfair competitive advantage to SLI, and that no OCI existed on any other basis. AR 8412.

In response to ZIN Tech's GAO bid protest, NASA conducted a second and specific OCI review to evaluate whether Leidos' role on SpaceDOC III presented any form of OCI with respect to its work on LAMS, including impaired objectivity, biased ground rules, and unequal access to information OCIs. AR 12142-48. The contracting officer's investigation included reviews of both the SpaceDOC III and LAMS contracts, as well as consultations with the SpaceDOC III contracting officer's representative, the SpaceDOC II contracting officer's representative, the SpaceDOC II and III alternate contracting officer's representative, the LAMS contracting officer, and the LAMS contracting officer's representative.[11] AR 12144, 12309-12310.

The OCI investigation included various factual findings and responses to the protester's allegations. AR 12142-48. For example, NASA stated that the investigation revealed that the design, development, test, and evaluation (DDT&E) work for the LAMS contract was completed on a predecessor contract (other than LAMS), and even though there was some additional minor DDT&E work to be completed, all of that work would be done "within the scope of the LAMS contract," and not any other contract, such as SpaceDOC III. AR 12148. The agency also confirmed that the Defense Contract Management Agency performs the pre-delivery inspections of LAMS deliverables, and that post-delivery, the evaluation and testing activities of LAMS deliverables are performed under a support services contract vehicle other than SpaceDOC and are also done under strict supervision of NASA personnel. AR 12147-48.

Finally, the contracting officer explained there is "little to no likelihood" that performance under the SpaceDOC contract would have any bearing whatsoever on the LAMS

---

held by SLI and its subcontractors. AR 8396-418. NASA specifically evaluated potential OCIs presented by SLI's major subcontractor, Leidos, due to Leidos' role on other NASA projects. With respect to the LAMS Contract, NASA determined that there is no risk of an unfair competitive advantage to SLI, and that no OCI exists on any other basis. AR 8412. NASA found that neither offeror presented an OCI with respect to the SpaceDOC III contract. AR 8852.

[10] NASA considered Leidos' role on the Safety, Health, and Mission Assurance ("SHeMA-2") Contract and found that there is no actual or apparent OCI. AR 8401.

[11] In conducting the OCI investigation, NASA spoke with the following individuals to complete a comprehensive investigation: [redacted]. AR 12144.

contract, including with respect to use of Glenn Research Center's telescience support center, as there had been no previous orders under SpaceDOC II that directly supported either Artemis operations or Orion projects.  AR 12148.  In any event, because the SpaceDOC III contract is to be performed utilizing a specific ordering structure, the contracting officer noted that any later identified work that has the potential to present an OCI could be assessed and avoided by, for example, assigning the work to a different contractor other than Leidos for that particular order. *Id*.  Ultimately, the contracting officer concluded "there is no impaired objectivity OCI with respect to the LAMS contract that would preclude award of SpaceDOC III to [Sierra Lobo]."  *Id*.  NASA affirmatively concluded that "the SpaceDOC III contractor is not in a position to draft requirements or statements of work for LAMS, benefit from any unequal access to information in any future LAMS competition, or suffer impaired objectivity from performance of the LAMS contract."  *Id.*

In its Cross Motion, the Government asserts that NASA conducted a well-reasoned, thorough investigation and analysis of the OCI allegation and rightfully rejected ZIN Tech's allegations as meritless.  This Court agrees.  Although the record is clear that NASA performed a thorough investigation ruling out any potential OCI, ZIN Tech maintains that the contracting officer's investigation was "hurried," and that the contracting officer "failed to meaningfully investigate the significant danger" posed by Leidos' work on the LAMS contract.  ECF No. 28 at 21, 26.  Despite NASA's thorough investigation, ZIN Tech argues here that "there is a significant potential that Leidos will be supporting Orion-related operations, testing or evaluation of the life-safety critical LAMS system it produces."  ECF No. 28 at 26.  ZIN Tech argues that "if that happens, Leidos (or its teammate) may be asked to pass judgement on the performance of its own LAMS system."  *Id.*  These same allegations were considered during NASA's investigation, and the contracting officer determined that ZIN Tech's statements were not accurate as the:

> [Design, Development, Test & Engineering work ("DDT&E")] for LAMS was completed on a predecessor contract. Although the scope of the LAMS contract includes some additional DDT&E work based on some additional data received from the Artemis II mission, this scope is relatively minor. Furthermore, this additional DDT&E work is included within the scope of the LAMS contract itself and is not being performed under any other contract. Consequently, there is no possibility of the SpaceDOC III contractor performing DDT&E of the Orion capsule's LAMS system.

AR 12145.  Thus, the record shows that ZIN Tech's allegations are unfounded.  Further, ZIN Tech inexplicably argues that NASA interviewed the wrong people in performing its OCI investigation, but as explained above, *see supra* footnote 11, the record shows that NASA interviewed all the appropriate contracting officers and contracting representatives necessary to complete a comprehensive investigation.  *See* FAR 9.504(b).  In addition, ZIN Tech brought these same allegations before the GAO and the GAO denied ZIN Tech's protest finding that ZIN Tech failed to support its allegation beyond mere speculation:

> [T]he protester has not provided any hard facts that would lead us to conclude there is an impaired objectivity OCI. In response to the agency's investigation, the

protester has not identified which work in the SpaceDOC III contract would put
Leidos in a position to evaluate its own performance under the LAMS contract.
Notably, the protester has not refuted the agency's statements that additional
DDT&E work for the LAMS contract would be completed within the scope of that
contract, or that inspections, evaluations, and testing of the LAMS deliverables are
done by another agency or under a different contract vehicle other than SpaceDOC
III. The protester's vague and conclusory responses are insufficient to demonstrate
that an impaired objectivity OCI exists or has the potential to exist due to Leidos's
work on the LAMS contract.

AR 12286-87. Therefore, the GAO found that ZIN Tech failed to show that NASA's award to
SLI presented any kind of OCI, and its impaired objectivity allegations amounted to no more
than mere speculation. Similarly, here, ZIN Tech's protest before the Court has presented no
hard facts that warrant a different outcome. *See PAI*, 614 F.3d at 1352 ("To demonstrate that
such a determination is arbitrary or capricious, a protestor must identify 'hard facts'; a mere
inference or suspicion of an actual or apparent conflict is not enough.") (quoting *C.A.C.I., Inc.-
Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)). ZIN Tech's arguments are not
supported by the record and thus equate to mere speculation.[12] The Agency is entitled to
significant discretion in identifying and mitigating conflicts of interest, and here NASA
performed multiple rounds of OCI analysis and investigation, each time concluding that no OCI
exists. The FAR "recognize[s] that 'the identification of [organizational conflicts of interest] and
the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of
considerable discretion." *Id.* at 1352 (quoting *Axiom Res. Mgmt. v. United States*, 564 F.3d
1374, 1382 (Fed. Cir. 2009)).

Rather than point to evidence of an actual or apparent OCI, ZIN Tech argues that OCIs
are inevitable between SpaceDOC III and LAMS, and that it is unreasonable to think that NASA
will appropriately deal with an OCI should one arise. ECF No. 28 at 19-20. This allegation is
contrary to the record. NASA's investigation concluded that:

Even if there were a possibility, arising from the SpaceDOC III SOW, of the
SpaceDOCIII contractor gaining an unfair competitive advantage with respect to
the LAMS contract from drafting requirements or other material to be incorporated
into a statement of work, adequate measures are in place to avoid any realization of
that possibility. First, the SpaceDOC III contract contains the NFS 1852.209-71
Limitation of Future Contracting clause, which, in relevant part, renders the
Contractor ineligible to perform work described in a solicitation that incorporates

---

[12] In its Response, ZIN Tech asserts that the Government agrees that the scope of the
statement of work (SOW) for SpaceDOC III "could mean that SLI could review the work of
Leidos." ECF No. 35 at 2 (citing ECF No. 32 at 10). In its Reply, the Government states that
this is incorrect. The Government states that while "we point out in our motion that the
SpaceDOC III SOW generally includes the potential to support Orion and Artemis operations,
but as established in our motion and in the Contracting Officer's OCI Investigation
Memorandum, there is no rational way that this would result in SLI reviewing the work of
Leidos, its major subcontractor." ECF No. 32 at 9-12 (citing AR 12142-48); *see also* AR 3126.

specifications or statements of work that the contractor, through performance of SpaceDOC III, was required to develop. (*See* AR Tab 4b at 32-33). SpaceDOC III also contains the NFS 1852.237-73 clause, Release of Sensitive Information (June 2015), which requires that the Contractor "must be operating under … [NFS] clause at 1852.237-72, Access to Sensitive Information" and "obligates the service provider to … (1) comply with all specified procedures and obligations, including the O[CI] Avoidance Plan, which the contract has incorporated as a compliance document" with a mandatory flow-down for subcontracts. (*See* AR Tab 04b at 78-79).

Second, the SpaceDOC II contract contains the NFS 1852.237-72 Access to Sensitive Information clause, which incorporates an OCI Avoidance Plan as a compliance document. (*See* AR Tab 4b at 51). The RFP included specific instructions for preparing an acceptable OCI Avoidance Plan, including provisions to ensure that the Plan's restrictions are flowed down to subcontractors. (*See* AR 35-36).

Third, the LAMS contract also includes the Access to Sensitive Information clause, as well as a Disclosure of Conflict Interest After Award clause, which states, "If, at any time during the performance of this contract, the Contractor or Government identifies an actual or potential organizational conflict of interest that was not adequately disclosed and resolved prior to award, the disclosing part shall make a prompt and full disclosure in writing to the other party. This disclosure shall include a description of the action that needs to be or has been taken in order to resolve the conflict. This requirement also includes subcontractors' actual or potential organizational conflicts of interest not adequately disclosed and resolved prior to award." Accordingly, even if there were a possibility that the SpaceDOC III SOW could give rise to a biased ground rules OCI with respect to the LAMS contract, the SpaceDOC III contract contains measures that adequately avoid the realization of such a possibility.

AR 12146.  Thus, NASA reasonably concluded that even if it is possible for a SpaceDOCIII contractor to gain an unfair competitive advantage with respect to the LAMS contract, appropriate measures are in place that would mitigate and avoid a conflict of interest.  Moreover, the record clearly demonstrates that there are no actual or apparent OCIs that could or should prevent NASA from awarding the contract to SLI, and to the extent that any OCI does arise, SLI submitted an OCI Plan in accordance with the Solicitation requirements, which NASA determined would mitigate potential OCIs.  *See* FAR 9.504(e) ("The contracting officer shall award the contract to the apparent successful offeror *unless a conflict of interest is determined to exist that cannot be avoided or mitigated*." (emphasis added)).  Accordingly, the Court holds that NASA's OCI determination is reasonable and supported by both the Solicitation and FAR requirements.

## II.    NASA Properly Evaluated Offeror's Key Personnel under Factor 1.

### A.  NASA properly evaluated SLI's Key Personnel.

ZIN Tech argues that NASA erred in evaluating SLI's key personnel because it should have assessed a weakness for SLI proposing a current employee of ZIN Tech's— ███████ ███████ —as one of its key personnel.   ECF No. 28 at 22-23.   ZIN Tech does not claim that SLI misrepresented ███████ availability or that the Solicitation prohibited proposing personnel who are not yet employed by the offeror, but instead ZIN Tech argues that because ██ ███████ does not currently work for SLI, SLI "cannot promise [he] will be available for contract performance."   ECF No. 28 at 22-23.   The Court agrees with the Government that this position is meritless and refuted by the Solicitation and applicable law.[13]

Here, the Solicitation required offerors to identify key personnel position descriptions and qualifications but did not require naming specific individuals who would fill those positions.  AR 3055.  If offerors identified a specific person to fill a key personnel position, they were to provide a one-page resume for that person.  *Id.*  Further, the Solicitation contemplated that offerors might propose incumbent personnel as key personnel.  Under Volume I – Mission Suitability, Subfactor 3 – Management Plan and Approach, NASA was to evaluate offerors on "the effectiveness, benefits, and adequacy of their plans for establishing the workforce, *including any plans for hiring employees of the incumbent contractor*."  AR 3084 (emphasis added).  Thus, the Solicitation does not prevent offerors from proposing incumbent personnel as key personnel or limit offerors to proposing only current employees.

SLI proposed ███████ , a current ZIN Tech employee, to fill its Deputy Program Manager position, and provided his one-page resume in accordance with the Solicitation requirements.  AR 5572.  There was no reason for NASA to question SLI's representation that ██ ███████ would fill the Deputy Program Manager position upon award, and thus there was no basis to assign SLI a weakness for this aspect of its proposal.  *See Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1331 (Fed. Cir. 2011) (Absent "significant countervailing evidence . . . that should create doubt whether the offeror will or can comply," the agency may rely on the offeror's representations in its bid.).  Thus, ███████ position as an employee on the incumbent contract is not "significant countervailing evidence" showing that ███████ ███████ is unavailable to SLI.[14]

_____

[13] ZIN Tech cites to *PAE Applied Technologies, LLC v. United States*, 153 Fed. Cl. 573, 581-82 (2021), stating that this case stands for the proposition that an "agency rationally rated protestor 'unacceptable' when protestor relied on key personnel employed on incumbent contract."  ECF No. 28 at 29.  ZIN Tech's case summary, however, does not capture the Court's finding in that case.  In that case, this Court found that the agency reasonably gave a bidder an unacceptable rating because the proposal failed to submit letters of intent as required by the Solicitation and listed key personnel that recently resigned from the incumbent contract.  The facts differ here, however, because ███████ still works on the incumbent contract and, as ZIN Tech concedes, will "continue to support the program under the SpaceDOC III program." ECF No. 28 at 23.

[14] In its Response, ZIN Tech cites *Conley & Assocs., Inc. v. United States*, 142 Fed. Cl. 177 (2019), arguing that the agency in that case rationally rated a protestor "unacceptable" when the protestor relied on key personnel employed on incumbent contract.  ECF No. 35 at 8-9.  This,

SLI confirmed that ▮▮▮▮▮ would be available to perform the contract should SLI receive the award because SLI obtained a letter of commitment from ▮▮▮▮▮ prior to proposal submission, confirming his plan to join SLI if SLI won the SpaceDOC III award. Accordingly, NASA acted in accordance with the Solicitation in accepting ▮▮▮▮▮ as one of SLI's proposed key personnel and rating SLI's proposal as it did. *See Orion Int'l. Tech. v. United States*, 66 Fed. Cl. 569, 573-74 (2005) (finding that it was permissible to propose an incumbent employee and noting that "[n]o case or board decision cited supports the proposition that a bidder may not include the name of a potential employee with its bid if the person is willing to work for the bidder upon award of the contract.").

## B. NASA properly evaluated ZIN Tech's Key Personnel.

ZIN Tech asserts that ZIN Tech's proposal "should have received a strength" because it "proposed ten key personnel, and identified highly-qualified personnel for each position," while SLI only identified six key personnel. ECF No. 28 at 22. It is unclear, however, to the Court what ZIN Tech attempts to allege here because the record shows that ZIN Tech "received a strength [in MP2] for a complete organization staffed with personnel with well-suited experience and certifications." AR 8888.

Although the argument ZIN Tech made in its Motion is unclear, ZIN Tech clarifies its allegation in its Response, contending that its "proposal should have been given a *significant strength* [instead of a strength] for the number, qualifications, and availability of its key personnel." ECF No. 35 at 10 (emphasis added). ZIN Tech also argues that its proposal was objectively superior and deserving of a strength while SLI should have been assessed a weakness. ZIN Tech concludes that SLI should not have also received a strength for the quality of the six key personnel identified in its proposal.

The Court agrees with the Government and Intervenor that these arguments are meritless. Besides pointing out that ZIN Tech offered ten key personnel while SLI offered six, ZIN Tech does not offer reasons why its proposal deserved a significant strength and why SLI should have been assessed a weakness.[15] Moreover, the fact that ZIN Tech offered more key personnel than SLI does not imply that it should have received a significant strength nor that SLI should have received a weakness. The Solicitation states that the offeror would be evaluated for the "appropriateness and relevancy of the resumes and/or position descriptions for up to ten key

---

however, mischaracterizes the facts in *Conley*. The facts in *Conley* do not involve key personnel currently employed by the incumbent. In *Conley,* the proposed key personnel was recently laid off and did not execute a contingent offer letter to rejoin the contractor upon contract award. 142 Fed. Cl. at 180. Here, the key personnel, ▮▮▮▮▮ is currently employed by the incumbent contractor, and SLI obtained a letter of commitment from ▮▮▮▮▮ and could expect that ▮▮▮▮▮ would be available for performance.

[15] ZIN Tech also generally references the availability of the key personnel as a factor favoring ZIN Tech's proposal over SLI's proposal. The Court need not address this issue again as the Court has examined ZIN Tech's allegations regarding the availability of SLI's key personnel above and found that NASA rationally evaluated this issue.

personnel or key positions" it identified, not for the number of key personnel identified. AR 1939,1910; *see also* AR 1761 ("NASA updated the language in the Final RFP to make it clear that the Offeror shall identify up to a total of ten key personnel."). That SLI also received a strength for the quality of the six key personnel identified in their proposal, therefore, is not unequal treatment. AR 8885 ("In MP2, the proposed received a strength for an effective multi-contractor integrated team with highly qualified key personnel in the Program Management positions."); *see also* AR 8586, 8694.

### C. NASA properly evaluated ZIN Tech's Factor 1 Mission Suitability Subfactors 1 and 3.

The Solicitation contemplates a three-part assessment for each subfactor under Factor 1, to reach an overall rating. Factor 1, Mission Suitability consists of three subfactors, each weighted using a total number of points: (1) understanding technical requirements (400 points), (2) product assurance (200 points), and (3) management plan and approach (400 points). AR 3081-88, 3092. First, NASA assigns an adjectival rating for each of the three subfactors, the two relevant adjectival ratings here are:

| ADJECTIVAL RATING | DEFINITION | PERCENTILE RANGE |
|---|---|---|
| Excellent | A comprehensive and thorough proposal of exceptional merit with one or more significant strengths. No deficiency or significant weakness exists. | 91–100 |
| Very Good | A proposal having no deficiency and which demonstrates over-all competence. One or more significant strengths have been found, and strengths outbalance any weaknesses that exist. | 71–90 |

AR 3079. After assigning an adjectival rating, NASA assigns a percentile and multiplies the percentage against the total number of points for each subfactor (400 for subfactor 1, 200 for subfactor 2, 400 subfactor 3) to get a point total. This resulted in the following findings for each offeror in the final evaluation:

| | ZIN Tech | SLI |
|---|---|---|
| **Subfactor 1** | 360 points (90%) – Very Good | 368 points (92%) – Excellent |
| **Subfactor 2** | 122 points (61%) – Good | 126 points (63%) – Good |
| **Subfactor 3** | 360 points (90%) – Very Good | 384 points (96%) – Excellent |
| **Total** | 842 points (84%) – Very Good | 878 points (88%) – Very Good |

AR 8456-61. Here, ZIN Tech asserts that NASA's assessment of a "Very Good" rating of its proposal under subfactor 1, understanding technical requirements, and subfactor 3, management plan and approach, of the mission suitability Factor is unreasonable because it deserved an "Excellent" rating instead. ECF No. 28 at 24-25. ZIN Tech believes that it deserved an "Excellent" rating for both subfactors 1 and 3 because the weaknesses assessed to ZIN Tech under subfactor 1 were "relatively minor and [do] not [] materially detract from ZIN's proposal under this Subfactor." *See, e.g.*, AR 8883.

ZIN Tech further asserts that NASA's failure to assess an Excellent rating for subfactors 1 and 3 resulted in an overall decrease in ZIN Tech's rating under Factor 1. AR 3079-80 (percentile range (and therefore total points) is assessed based on the adjectival ratings). Finally, ZIN Tech contends that NASA's evaluation relies heavily on the "Excellent" rating assessed to SLI to conclude that its Factor 1 proposal was superior to ZIN Tech's. ECF No. 28 at 32.

The issue before the Court, therefore, is to determine whether NASA's assessment of "Very Good" instead of "Excellent" for these subfactors lacks a rational basis. Below, the Court reviews NASA's evaluation of both subfactors 1 and 3 and then examines whether NASA's evaluation of both subfactors is rational.

For subfactor 1, understanding technical requirements, the Source Selection Evaluation Board ("SSEB") found that ZIN Tech's "proposal contained 1 significant strength, 5 strengths, and 2 weaknesses." AR 8459.[16] The SSEB concluded that these weaknesses in ZIN Tech's proposal are outbalanced by the strengths and that, with no deficiencies, one significant strength, and demonstrating over-all competence, on subfactor 1 ZIN Tech's proposal fits the definition of "Very Good":

> ZIN's proposal fit the definition for a "Very Good" adjectival rating due to having no deficiencies, a significant strength, strengths that outbalanced the weaknesses that exist, and demonstrating overall competence. Because it found that the strengths clearly outbalanced the weaknesses, the SSEB determined that the proposal was at the high end of the "Very Good" category, and thus assigned the proposal a percentile score of 90%.

AR 8461. The SSA concurred:

> I find the two weaknesses that ZIN's proposal received under this Subfactor . . . to be relatively minor and not to materially detract from ZIN's proposal under this Subfactor. While I find ZIN's proposal to be very strong due to its thorough response under the Representative Base Order element, I determine that SLI's proposal has a slight advantage over ZIN's proposal under this Subfactor due to the comprehensive nature of SLI's proposal.

---

[16] For the first weakness, "[t]he ZIN proposal indicated a lack of understanding of risk mitigation in representative base orders #1 and #2, and hardware development." AR 8606 (Finding #8). The SSEB further reported that "[t]he Finding #8 weakness for [subfactors 1 and 3] was partially corrected in the FPR, however, the finding remained a weakness." AR 8461.[16]

For the second weakness, the SSEB found that "[t]he ZIN proposal demonstrated an ineffective approach to managing the Change Control Board (CCB)." AR 8603 (Finding #13). The SSEB reported that "the note on the [subfactor 3] content was not adequately addressed, so this Finding remained a weakness and became a [subfactor 3] weakness." AR 8460.

AR 8890-91.  For subfactor 3, the SSEB found that ZIN Tech's "proposal contained 1 significant strength, 5 strengths, and 1 weakness."  AR 8461.[17]  The SSEB concluded that the weakness in ZIN Tech's proposal was outbalanced by the strengths of the proposal and that, with no deficiencies, one significant strength, and demonstrating over-all competence, on subfactor 3 ZIN Tech's proposal fits the definition of "Very Good":

> Using the definitions of NFS 1815.305 & NASA Source Selection Guide, the SSEB reached consensus that under the Management Plan and Approach subfactor, ZIN's proposal fit the definition for a "Very Good" adjectival rating due to having no deficiencies or significant weaknesses, a significant strength, strengths that outbalanced the weakness that exists, and demonstrating overall competence. Because it found that the strengths clearly outbalanced the weakness, the SSEB determined that the proposal was at the high end of the "Very Good" category, and thus assigned the proposal a percentile score of 90%.

AR 8463.  The SSA concurred: "In the Management Plan and Approach Subfactor, ZIN's proposal is again strong, receiving the rating of Very Good."  AR 8891.  The SSA also stated, "I was most impressed by the significant strength that ZIN's proposal received under MP6 for proposing the highly beneficial use of its existing and fully operational office and manufacturing and assembly facilities located near GRC."  *Id.*  The SSA found "the weaknesses that ZIN received under this Subfactor for proposing unrealistic Government access to its data management system to be minor."  *Id.*  In conclusion, "I find SLI's proposal provides exceptional technical merit and has a distinct and material advantage over ZIN's proposal under the Management Plan and Approach Subfactor."  *Id.*

It is clear that both the SSEB and the SSA used the proper definition of "Very Good" when assessing the adjectival ratings for subfactors 1 and 3.  The fact that the SSA emphasized that ZIN Tech's weaknesses were found to be "relatively minor" does not imply that NASA should have given ZIN Tech an "Excellent" rating for subfactors 1 and 3.  Because the weaknesses were relatively minor, the SSA determined that the weaknesses were outbalanced by the strengths.  Indeed, the definition of "Very Good" states that the "strengths outbalance *any* weaknesses."  AR 3079.  It is possible, therefore, for a proposal to not have any weaknesses and still fall under the definition of "Very Good."  Thus, ZIN Tech's argument that the subfactors "Very Good" rating was unreasonable because of the finding that its proposal was "very strong due to its thorough response" ignores the fact that a "Very Good" rating requires a finding that the proposal "demonstrates over-all competence."  ECF No. 28 at 25; AR 3079.

Therefore, the SSA's statements do not, as ZIN Tech asserts, "unequivocally demonstrate that the Agency should have assessed ZIN Tech an 'excellent' rating."  ECF No. 28 at 25.  An excellent rating requires "[a] comprehensive and thorough proposal of exceptional merit with

---

[17] For the weakness, "[t]he ZIN proposal included a description of Government access to ZIN Data Management System (ZDMS) tools that was not realistic."  AR 8614 (Finding #15).  Although in its FPR, ZIN Tech provided a description of the tools "there was still a lack of clarity on which tools the Government has access to."  *Id.*  Therefore, the SSEB determined that this finding remained a weakness.  *Id.*

one or more significant strengths." AR 3079.  A very strong proposal can demonstrate "over-all competence" required for a "Very Good" rating without showing the exceptional merit required for an "Excellent" rating.  *Id.*  Further, the SSA's finding that subfactor 3 of ZIN Tech's proposal was strong and that she was impressed by its significant strength and its many strengths also does not show that the "Very Good" rating lacks a rational basis.  ECF No. 28 at 25.  Thus, it was rational for NASA to assign a "Very Good" adjectival rating to subfactors 1 and 3 of ZIN Tech's proposal.

Lastly, the record does not support ZIN Tech's allegation that NASA's evaluation "demonstrates that it relied heavily on the 'Excellent' rating" for SLI.  ECF No. 28 at 26.  On the contrary, the record shows that both the SSEB and SSA individually analyzed each proposal's strengths and any weaknesses and weighed them carefully before making a determination.

Regarding subfactor 1, the SSEB determined that SLI's "proposal was at the low end of the 'Excellent' category, and the SSEB therefore assigned the proposal a percentile score of 92%."  AR 8457.  This closeness is reflected in the SSA's analysis: "In the Understanding the Technical Requirements Subfactor, I find both SLI's and ZIN's proposals to be very strong in their technical merit."  AR 8890.  Ultimately, the SSA concluded that the strengths that SLI's proposal received within each element of this subfactor were "strong and impactful, providing a comprehensive and well-rounded response."  *Id.*  This gave SLI's proposal the "slight advantage" over ZIN's "very strong" proposal.  AR 8891.

Concerning subfactor 3, the SSEB determined that SLI's proposal "was in the middle of the 'Excellent' category, and therefore assigned the proposal a percentile score of 96%."  AR 8459.  Thus, while "ZIN's proposal is again strong" under this subfactor, the SSA explained, "I find that [SLI's] approaches are of exceptional merit and will be significantly impactful to the Government during contract performance and constitute a material discriminator in favor of SLI's proposal under this Subfactor."  AR 8891.

The record, therefore, does not support ZIN Tech's allegation that in the SSA's analysis the adjectival ratings were more important than the quality of the proposals that they represent or its allegation that the SSEB's assessments of subfactors 1 and 3 lacked a rational basis.  Thus, the Court holds that NASA's assessments of subfactors 1 and 3 were rational.

**III.    NASA's Factor 3 Past Performance Evaluation Was Reasonable and Complied with the Solicitation Evaluation Criteria.**

Under Factor 3, NASA evaluated offerors' three areas of relevant experience and past performance and any Major Subcontractor/Teaming Partners: Past Performance Narrative ("PPN"), Past Performance Questionnaires ("PPQ"), and Past Performance Databases ("PPD").  AR 3089.  The results of the PPN, PPQ, and PPD evaluations were then considered in determining the Level of Confidence rating.  *Id.*  Relevant to this protest, NASA defined three levels of confidence: Moderate, High and Very High.  AR 3090-91.

ZIN Tech argues that NASA erroneously (1) assigned the highest confidence rating to SLI's Volume 3 proposal; (2) failed to validate at least one of SLI's proposed contracts and

erroneously deemed Factor 3 concerns resolved by the unrelated Volume IV of SLI's proposal; and (3) treated the Factor 3 proposals differently, in favor of SLI. The Court considers each of these arguments below.

### A. NASA Complied with the Solicitation Requirements in Evaluating OMES II when Rating SLI Very High Level of Confidence.

ZIN Tech alleges that NASA failed to validate SLI's Past Performance on the Omnibus Multidiscipline Engineering Services contract ("OMES II"),[18] which is one of the five contracts SLI presented in its Past Performance Factor submission showing relevant experience demonstrating SLI's ability to meet the requirements of this Solicitation. ECF No. 28 at 27-30, AR 3723. Therefore, ZIN Tech asserts that NASA should not have awarded SLI a High Level of Confidence rating. ECF No. 28 at 27-30. ZIN Tech admits that, because NASA could not access PPD or PPQs for the OMES II contract, the Solicitation required NASA to issue a neutral rating for OMES II. ECF No. 28 at 27. ZIN Tech further admits that NASA did exactly that— NASA applied a neutral past performance rating for OMES II, and thus OMES II did not factor into SLI's overall Confidence score. ECF No. 28 at 30. Nonetheless, ZIN Tech argues that this was a "prejudicial error," concluding that "[h]ad the SSEB validated ratings for OMES II, its level of confidence rating could have changed." ECF No. 28 at 30.

In its Cross-Motion, the Government argues that ZIN Tech's allegations are wholly unsupported by the record and should be dismissed. The Court agrees. The Solicitation states that where past performance information is unavailable, NASA will assign a neutral rating. AR 3090 ("Offerors without a record of relevant experience and past performance, or for whom information

---

[18] In its Past Performance Factor submission, SLI gives the following brief description of its work on the OMES II contract to show its relevance:

> SLI provides [NASA's Goddard Space Flight Center's ("GSFC's")] Engineering and Technology Directorate (ETD) science mission engineering support that includes multidiscipline, full-lifecycle services for components, subsystems, systems, science instruments, spacecraft, International Space Station (ISS) payloads, GSE, simulators, models, and prototypes. OMES II is highly relevant in content and complexity. SLI leads a team performing HW and SW development, I&T, and deployment for spacecraft and observatory projects requiring complex mechanical and electrical engineering and manufacturing tasks. Work includes development of new technology, components, subsystems, and instruments to enable future space and science missions. SLI performs candidate, feasibility, and systems definition studies; technology development, engineering, and analysis; preliminary and detailed design; fabrication and assembly; I&T; verification and validation (V&V); launch and post-launch operations and sustainment; R&T; procurement and management; documentation; maintenance and sustaining engineering; performance assurance; and systems safety. SLI supports two major project offices at NASA/GSFC—NASA's Exploration and In-Space Services (NExIS) and the Joint Polar Satellite System (JPSS).

AR 3734.

on past performance is not available, shall receive a neutral rating in accordance with FAR 15.305(a)(2)(iv).").  Because NASA could not locate the PPQ and PPD for SLI's OMES II experience, NASA calculated the overall Confidence Level rating using the PPQs and PPDs for the remaining contracts: ETIS II, MEDALS, CMC3, and REMIS.  AR 8647-48.  ZIN Tech admits this and even includes excerpts of NASA's evaluation where NASA explicitly compiled Past Performance ratings from the contracts *besides* OMES II.  ECF No. 28 at 29.  The AR reflects that the whole of SLI's Past Performance on these contracts equated to a Very High Level of Confidence rating.  AR 8647-48.  Accordingly, ZIN Tech fails to show that NASA deviated from the Solicitation evaluation requirements or applicable law.

Further, ZIN Tech has not shown that NASA's treatment of SLI's Past Performance ratings prejudiced ZIN Tech in any way in the competition.  ZIN Tech does not even argue that but for NASA's evaluation of OMES II, ZIN Tech would have won the contract award.  Instead, ZIN Tech generally alleges that "[h]ad the SSEB validated ratings for OMES II, its level of confidence rating could have changed," not that SLI's level of confidence rating would have changed, demonstrating that ZIN Tech's allegations are purely speculative.  Pl. ECF No. 28 at 30.  ZIN Tech does not point to any evidence in record that the OMES II PPQ and PPD ratings would have lowered SLI's Overall Confidence rating.  Thus, there is no basis to find that the OMES II Past Performance evaluation prejudiced ZIN Tech.

### B. The SSEB's Consideration of Information Submitted By Offerors in Response to NASA's Request For Final Proposal Revisions Was Not Arbitrary, Capricious, or an Abuse Of Discretion

The record shows that during discussions, NASA requested additional information from SLI regarding SLI's subcontractor Leidos' proposed role on the contract.  AR 8507-08.  Under a heading titled, "Past performance," NASA stated, "Please elaborate on the proposed role of your Major Subcontractor.  The proposal did not clearly identify what specific roles your Major Subcontractor would perform on the contract so it was difficult for the Government to determine whether the relevant examples provided were representative of the actual work they would perform." AR 5114, 5115, 5132.  As a result of these discussions, SLI updated its narrative in Volume I of its proposal to better address how it planned to use Leidos in its performance, along with the strength and value it added to SLI's proposal.  AR 5492.

ZIN Tech asserts that the SSEB improperly evaluated SLI's "past performance by evaluating a different volume of its proposal."  ECF No. 28 at 30.  ZIN Tech alleges that NASA erred by considering revisions SLI made to Volume I of its FPR as addressing a weakness that NASA identified during discussions in Volume III of SLI's proposal.[19]  ECF No. 28 at 30-33.

---

[19] ZIN Tech alleges that SLI addressed Leidos' role in Volume IV of its proposal, but the AR reflects that SLI added detail about Leidos' role to Volume I of its proposal. AR 5492.  The added detail aligns with NASA's findings in its Additional Evaluation of Past Performance document.  AR 8524.

The Court agrees with both the Government and Intervenor that NASA acted in accordance with the Solicitation and applicable law in considering Volume I of SLI's proposal in its evaluation.

First, ZIN Tech's argument that SLI had to submit a FPR to Volume III in response to NASA's request for more information about the proposed role of SLI's major contactor is not supported by the record. ECF No. 28 at 32. While NASA requested information about the relationship between SLI and its major subcontractor under a heading titled, "Past performance," the request did not state that the revised information had to be placed in Volume III, past performance information. *Id.* Further in its letter requesting SLI to submit its FPR, NASA directed SLI to revise Volume I of its proposal and did not direct SLI to revise Volume III of its proposal. AR 5141-43. Thus, ZIN Tech's argument that SLI was required to submit its FPR under Volume III is not consistent with the record.

Moreover, under the Solicitation, the information requested relates to both Volume I and Volume III. The Solicitation requires an offeror to include a description of work that it expects to obtain from a major subcontractor under Volume 1, Mission Suitability, MP 2 Organizational Structure and Relationship.[20] The information NASA requested from SLI regarding the proposed role of its major subcontractor, therefore, would be appropriate information suited to Volume I of SLI's proposal. The description SLI's major subcontractor's work from Volume I would then be used to make sense of the past performance information in Volume III. AR 5114. SLI, therefore, submitted a FPR to Volume I and not to Volume III. *See, e.g.*, AR 5492-99.

Second, even if the information had to be addressed in Volume III of SLI's revised proposal, the Solicitation would allow NASA to review and consider this information. Here, the Solicitation contemplated that NASA could consider any information available in evaluating Past Performance, and that NASA would necessarily reference other Volumes of the proposal in determining whether subcontractor past performance was relevant to SpaceDOC III:

> (e) The Government reserves the right to conduct one-on-one discussions with prior contracts' cognizant business and technical personnel, whether or not listed in the proposal, for both the PPQ and PPD sections. The Government reserves the right to consider other sources of information available and information available in Government past performance databases.
> . . .
> (h) . . . Subcontractor experience (both for Major Subcontractors and Minor Subcontractors in accordance with paragraph (f) of this provision) will only be deemed relevant *if the past performance information is deemed relevant to the work they are assigned in the Offerors' (and/or Major Subcontractor's) proposal.*

---

[20] "The Offeror shall provide an organizational chart and a narrative description of the organizations (down to the major discipline letter) to perform the contracted effort." AR 1909. Moreover, "[t]his organizational chart and narrative shall include description of work efforts and percentage of work that the Offeror expects to obtain through joint ventures, teaming, major and minor subcontracting, or consulting agreements, over the life of the contract." AR 1909.

AR 3090 (emphasis added).  NASA could not have determined the relevancy of SLI's past performance without looking to the portions of SLI's proposal that described Leidos' planned work.  NASA was required to consider all pertinent information related to Past Performance, regardless if it appeared within or outside of the proposal.  *See KACE Co., LLC v. United States*, 167 Fed. Cl. 192, 208 (2023) (citation omitted) ("Regarding past performance evaluations, moreover, agencies are not restricted to references submitted by offerors and must draw upon internal information, even if not cited by the offeror.").

Further, the Solicitation explicitly addresses NASA's ability to consider other available sources related to the past performance of offerors and subcontractors, in conjunction with "the work they are assigned in the . . . proposal." AR 3090.  Thus, NASA's consideration of Volume I, which describes the proposed role of SLI's major subcontractor, was necessary to review when evaluating SLI's Past Performance.  Because the Solicitation instructs NASA to review other sources related to the past performance of offerors and subcontractors, NASA acted consistently with the Solicitation and applicable law when revieing SLI's Volume I.  *See, e.g.*, *Perspecta Enterprise Sols., LLC v. United States*, 151 Fed. Cl. 772, 784 (2020) (upholding contract award where "the [Agency] determined that prices for certain CLINs were unrealistically low, [but] *looking to the proposal as a whole*, determined that [awardee's] proposed efficiencies explained why its prices were so low, and, thus, its prices were considered realistic." (emphasis added)).

## IV.  NASA did not Engage in the Disparate Treatment of SLI and ZIN Tech with Respect to Past Performance Cost Overruns.

To prevail on a disparate treatment claim, the protestor must demonstrate that its proposal was downgraded for a "substantially indistinguishable" deficiency to one in the awardee's proposal.  *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).  If the protestor does not meet this standard, the Court should not second-guess the agency's discretionary determinations in its evaluations.  *See id.* at 1373 ("We see no reason to depart from the Claims Court's 'substantively indistinguishable' standard. If a protestor meets this threshold, a reviewing court can then comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters.").

ZIN Tech asserts that "the Agency disparately treated SLI with respect to cost overruns." ECF No. 28 at 33.  The Solicitation required offerors to disclose all cost overruns in their Past Performance examples: "The Offeror shall also identify and explain any cost overruns or underruns, completion delays, performance problems, terminations and the Offeror's implemented corrective actions." AR 3073.  According to ZIN Tech, both proposals "admit certain cost overruns throughout performance of the proposed contracts.  However, only ZIN Tech's past performance was downgraded due to concerns regarding cost overruns." ECF No. 28 at 35 (citing AR 5160).  ZIN Tech, however, fails to show disparate treatment regarding the offerors' admitted cost overruns for two reasons.

First, the overruns disclosed in SLI's proposal were materially different and distinguishable from ZIN Tech's cost overruns in multiple ways, which warranted the ratings that NASA assigned to each offeror.  ZIN Tech's admitted cost overrun to complete SoFIE was 16%, while SLI's highest cost overrun was ████████████. ECF No. 28 at 33-34.  Moreover,

the SSEB discovered that ZIN Tech received one "marginal rating related to cost" with comments that included "invoicing issues where costs did not match 535M reports," there were insufficient variance [that] explanations made it difficult for NASA to ascertain if the project was within the planned cost projections, introduced risk to the Government's budgetary forecast, and the contactor demonstrated poor budget management during this evaluation period." AR 5105. SLI, however, did not receive any marginal ratings regarding its past performance or any similar comments regarding cost overrun concerns. AR 5090-91; 8870. The offerors, therefore, were not "substantially similar" with regard to cost overrun concerns.

Second, SLI disclosed all of its relevant cost overruns and its corrective action in response to any overruns in its Past Performance proposal, Volume III. *See* AR 3728 (ETIS II), 3733 (MEDALS), 3737 (OMES II), 3742 (CMC3), 3746 (REMIS). By contrast, ZIN Tech failed to include particular cost overruns in its proposal, and instead NASA discovered the cost overruns that impacted ZIN Tech's Overall Confidence rating through investigation of ZIN Tech's Past Performance examples. *See* AR 5160 ("The following adverse past performance information was discovered outside of the existing CPARS reports for SpaceDOC II that ZIN has not had an opportunity to respond: . . . Projects are having issues with cost overruns and the Government has received multiple cost overrun proposals in the last six months."). Further, NASA found that ZIN Tech's explanations of its cost overrun corrective actions did not sufficiently explain how ZIN Tech would prevent similar overruns in the future. AR 8655. NASA had no similar concerns regarding SLI's proposal. These differences in SLI and ZIN Tech's proposals demonstrate that the cost overruns at issue were not "substantively similar," and NASA acted within its discretion in treating them differently in its Past Performance evaluation.

Thus, ZIN Tech's disparate treatment claim fails here because ZIN Tech has not shown that the SSEB downgraded its past performance due to cost overrun concerns that were substantially similar to SLI's admitted cost overruns, and ZIN Tech also fails to show that the SSEB engaged in disparate treatment regarding cost overruns. *See Office Design Grp.*, 951 F.3d at 1372 (To prevail on a disparate treatment claim, the protestor must demonstrate that its proposal was downgraded for a "substantially indistinguishable" deficiency to one in the awardee's proposal.).

## V.    The OHA Properly Held that SLI is an Eligible Small Business for this Procurement.

This Solicitation provides for a 100% small business set-aside with a size standard of 1,000 employees.[21] AR 13148. To bid on a contract, a concern must self-certify that it meets the size standard for the particular solicitation. 13 C.F.R. § 121.405(a) (2020). On May 2, 2023,[22]

---

[21] Pursuant to its statutory authority, the SBA sets size standards that determine if a business concern is eligible for "[g]overnment programs and preferences reserved for 'small business' concerns." 13 C.F.R. § 121.101 (2023).

[22] The size of a concern is determined as of the date when the concern submits a written self-certification. 13 C.F.R. § 121.404(a) (2023).

SLI submitted its self-certification to the Area Office that it meets the small business size standard. AR 12354, 13132. SLI's self-certification also explains that SLI is a minority member of two populated[23] joint ventures,[24] HX5 Sierra and NAS. [25] AR 12354, 13132.

Here, ZIN Tech-asserts that the OHA's decision erred by: (1) ignoring evidence that mandates a finding of affiliation on the basis of common ownership and management; (2) ignoring evidence that mandates a finding of affiliation on the basis of a longstanding inter-relationship between the same joint venture partners; and (3) applying 13 C.F.R. § 121.103(h) to calculate SLI's employee count and finding that SLI is an eligible small business concern. The Court addresses each of these arguments below.

### A. The OHA Did Not Ignore Evidence that Mandates a Finding of Affiliation on the Basis of Common Ownership and Management.

In its Motion, ZIN Tech argues that the OHA ignored evidence that SLI and NAS are affiliated based on common management because SLI's Chief Operating Officer sits on the Board of Managers for NAS, as the "SBA considers factors such as ownership, ***management***, ***previous relationship with or ties to another concern***, and contractual relationship, in determining whether affiliation exists." ECF No. 45 at 18 (citing 13 C.F.R. 121.103(a)(2) (emphasis added)).

To support this argument, ZIN Tech points to SLI's SBA Form 355 which names  as the Chief Operating Officer, Corporate Secretary, and ████████████ in SLI.[26] AR

---

[23] A populated joint venture is "where work is performed by the joint venture entity itself and not by the individual joint venture partners." 13 C.F.R. § 121.103(h)(4) (2024).

[24] The other member of HX5 Sierra is HX5, LLC, and the other member of NAS is Bechtel National, Inc. ("BNI"). AR 12537.

[25] SLI also provided the SBA with joint venture operating agreements ("JVOAs") and other information such as a U.S. Government Accountability Office ruling referring to NAS as a joint venture. *See generally* AR Tab 75.

[26] ZIN Tech argues that the OHA refused to admit evidence that a manager at SLI is also a manager at the joint ventures. The OHA, however, did not ignore the evidence but found that the evidence was new on appeal, and thus, inadmissible:

> Appellant has submitted new evidence for consideration on appeal, i.e., Exhibits G and H, Industry Day participants and SLI's COO's LinkedIn profile, respectively. It is undisputed that this evidence was not presented to the Area Office. New evidence will not be considered unless the Judge on his or her own motion orders the submission of such evidence, or a motion is filed and served establishing good cause for the submission of such evidence. 13 C.F.R.§ 134.308(a). OHA's review is based upon the evidence in the record at the time the Area Office made its determination. Evidence that was not previously presented to the Area Office is generally not admissible and OHA will not consider it. Further, OHA will not consider new evidence where the proponent unjustifiably fails to submit the

12348.  In response to Question #9b of Form 355, whether a listed owner, officer or Board member of SLI is also an owner, officer, director, manager, or employee of another business, SLI acknowledged that ██████ was a Manager for NAS, a Manager for HX5 Sierra, a Manager for HX5-Sierra Lobo JV, LLC, and a Member and Secretary for ████.  AR 12349, AR 12353.

Further, ZIN Tech asserts that the OHA ignored its argument that SLI and NAS are affiliated based on common management.  Regarding this argument, the OHA found that,

The next set of arguments, from SLI being and NAS being affiliated based upon common management, SLI being economically dependent on NAS, to SLI and NAS being affiliated under the totality of the circumstances, are new arguments on appeal and based upon new evidence and/or speculation. Thus, I will not consider them here. 13 C.F.R. §§ 134.308(a), 134.316(c).

AR 13144.  ZIN Tech, however, has not shown that it raised this argument with any specificity in its size protest before the Area Office, so it was not an error of law for the OHA to find that ZIN Tech's argument was new on appeal and to dismiss that argument as a result.  *See Ideogenenics LLC v. United States,* 138 Fed. Cl. 672, 706 (2018) (finding OHA's decision to exclude new evidence consistent with regulation and controlling precedent).  Further, this Court holds that the OHA's correctly dismissed this argument because its decision is based upon the factual record developed before the Area Office, and thus, any new evidence or arguments brought before the OHA on appeal are not properly before the OHA.  *See* 13 C.F.R. § 134.316(c) ("The Judge will not decide substantive issues raised for the first time on appeal, or which have been abandoned or become moot."); *Oxyheal Med. Sys., Inc.*, SBA No. SIZ-5707, 2016 SBA

_____

evidence during the size review.  *Size Appeal of Rocky Mountain Medical Equipment, LLC,* SBA No. SIZ-6129, at 12 (2021).  Here, Appellant could have submitted this evidence to the Area Office but did not do so. Furthermore, Appellant failed to file and serve a motion establishing good cause for the admission of such evidence. Sections II.B and II.C, *supra.* Accordingly, I EXCLUDE Appellant's Exhibits G and H from the record. I also DENY SLI's Motion to Supplement the Record and EXCLUDE SLI's proffered new evidence, which also was available at the protest stage.

AR 13141.  Thus, the Court holds that the OHA did not err by ignoring evidence, as this evidence was new on appeal.  *See Ideogenenics LLC*, 138 Fed. Cl. at 706 (finding OHA's decision to exclude new evidence consistent with regulation and controlling precedent). Further this evidence does not appear to be relevant to the argument ZIN Tech is raising because ZIN Tech also states this evidence "merely reflected information that ZIN Tech expected, and the record confirms, was already present in Sierra Lobo's Form 355 response to the original protest but [allegedly] ignored by SBA."  ECF No. 45. at 11 ("OHA didn't need to rely upon those sources because that information was already disclosed in Sierra Lobo's Form 355 response.").  Thus, even if the OHA erred by not admitting this new evidence on appeal, which it did not, the error would have been harmless.

LEXIS 8, 2016 WL 692818, at *8 (Jan. 19, 2016) ("OHA's review is based upon the evidence in the record at the time the Area Office made its determination.")

The Court agrees with Intervenor that this Court need not consider this argument on the merits as it was not properly before the OHA on appeal.[27]  *Swift & Staley, Inc. v. United States*, 159 Fed. Cl. 494, 503 (2022) (considering whether an argument was "was properly before OHA on appeal" before evaluating the argument on the merits);  *Elmore v. DOT*, 421 F.3d 1339, 1342 (Fed. Cir. 2005) ("We have recognized that a litigant who fails properly to raise an issue before an administrative agency ordinarily is precluded from litigating that issue before us."); *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1261 (Fed. Cir. 2015) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975) (Plaintiff's "failure to present this argument in the pending OHA appeal deprived the agency of 'an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.'"); *Team Waste Gulf Coast, LLC v. United States*, 135 Fed. Cl. 683, 687 (2018) (holding that arguments not presented to the OHA have been waived).

Even if the Court held that the OHA erred by not considering this argument, a review of other OHA decisions show that this alleged error would not have changed the outcome of the case, *i.e.* the OHA would have found that SLI was still considered small.  *Baird Corp. v. United States*, 1 Cl. Ct. 662, 666 (1983) (This Court affords "special deference" to decisions by the OHA due to the SBA's "quasi-technical administrative expertise and a familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme."); *Precise Sys., Inc. v. United States*, 122 Fed. Cl. 263, 270 (2015) (citing *LB & B Assocs., Inc. v. United States*, 68 Fed. Cl. 765, 772 (2005)) (the Court defers to "OHA's interpretation of its own precedent, provided [that] the OHA's interpretation is rational and reasoned[.]").

---

[27] In its Reply, ZIN Tech argues that the OHA failed to properly find SLI was affiliated with HX5 and NAS under the totality of the circumstances test for affiliation.  ECF No. 51 at 9; *see* 13 C.F.R. §121.103(a)(5) ("In determining whether affiliation exists, **SBA will consider the totality of the circumstances**, and may find affiliation even though no single factor is sufficient to constitute affiliation." (emphasis added)).  The OHA found that ZIN Tech's argument that "SLI and NAS [are] affiliated under the totality of the circumstances, [is a] new argument[] on appeal and based upon new evidence and/or speculation. Thus, I will not consider them here." AR 13144 (citing 13 C.F.R. §§ 134.308(a), 134.316(c)).  For the same reasons given above, this Court need not consider this argument on the merits as it was not properly before the OHA on appeal.  However, even if this Court did consider this argument on the merits, the Court would still hold that SLI and NAS are not affiliated under the totality of the circumstances.  ZIN Tech asserts that "all of the[] points [made in its Motion] demonstrate that OHA failed to properly find SLI was affiliated with HX5 and NAS under the totality of the circumstances test for affiliation." ECF No. 51 at 16.  Because the Court has reviewed the points made in ZIN Tech's brief and has found that all of ZIN Tech's arguments fail to show that SLI and NAS are affiliated, combining ZIN Tech's arguments under the totality of the circumstances test would not change this outcome.

Indeed, the OHA has found that for an individual "to be considered management for the purposes of common management affiliation, he would have to exercise critical influence or substantive control over [the concern's] operations and be part of the firm's overall management." *Size Appeal of Lukos, LLC*, SBA No. SIZ-6047 (2020) (citing *Size Appeal of Hardwire, LLC*, SBA No. SIZ-5983, at 6 (2019)).  Other than merely pointing to the fact that ███ ██████ sits as one of the ██████████ managers on NAS's Board of Managers, ZIN Tech does not point to any evidence supporting that ██████████ had critical influence or control of the concern.  *See* AR 12623, 12677.

Under the OHA's precedent, the mere fact that ██████████ "sits on the Board of Managers" for NAS does not establish that he has the ability to exercise substantive control over both SLI and NAS.  "Where an individual is only one of a number of directors, OHA has held that he would not have had critical influence or control of the concern."  *Size Appeal of Point Blank Enters., Inc.*, SBA No. SIZ-5982 (2019) (citing *Size Appeal of Cambridge Int'l. Sys., Inc.*, SBA No. SIZ-5516, at 6 (2013)).  Thus, even if the OHA erred in failing to consider this basis for affiliation on the merits (which it did not), any such error was harmless because the scant evidence proffered by ZIN Tech does not prove that such affiliation exists.

### B.   The OHA Did Not Ignore Evidence that Mandates a Finding of Affiliation based on a Longstanding Inter-Relationship Between the Same Joint Venture Partners.

ZIN Tech asserts that the OHA ignored evidence that NAS represents a longstanding inter-relationship between the same joint venture partners that mandates a finding of general affiliation.   To support this argument, ZIN Tech contends that the sheer magnitude and duration of the work awarded to NAS somehow negate NAS' joint venture status.  ECF No. 45 at 20.  ZIN Tech also points to SLI's press release which said that NAS had "1802 Team Members" performing over $1.5 billion of work awarded in 2015.  AR 13044.  ZIN Tech also emphasizes that NAS's "total contract value was initially $181,179,220 and has been modified to $2,511,306,705.77."  AR 13046; ECF No. 45 at 13.

ZIN Tech, however, does not cite authority for its claim that the magnitude or duration of a single contract somehow renders the joint venture members affiliated. [28]  Further, ZIN Tech does not dispute that NAS "has been awarded one contract."[29]  AR 12701.  Moreover, ZIN Tech

---

[28] ZIN Tech also argues that NAS cannot be considered a joint venture because it "was established on a continuing, unlimited basis."  ECF No. 45 at 19.  ZIN Tech refers to the preamble of a rule that the SBA published on April 27, 2023, effective May 30, 2023, "SBA has consistently stated its view that a joint venture is not an on-going business entity, but rather something that is formed for a limited purpose and duration."  *See* 88 Fed. Reg. 26164, 26165, Ownership and Control and Contractual Assistance Requirements for the 8(a) Business Development Program.  The Court agrees with the OHA that this rule does not apply in this protest because it did not become effective until May 30, 2023, which was after the date of SLI's self-certification on May 2, 2023.

[29] SLI's submissions to the Area Office showed that each populated joint venture was

has not cited any authority to support its assertion that modifications of a joint venture's single contract could lead to a finding of general affiliation between and among the partners. The focus of the joint venture, after all, remains the single contract even if it has been modified and extended.

Contrary to ZIN Tech's assertion, the OHA fully considered that SLI and BNI have only formed one joint venture, NAS, and at the relevant date to determine size, NAS has only been awarded one contract. AR 13126. The OHA found,

> Appellant's argument that NAS represents "a longstanding inter-relationship or contractual dependence between the same joint venture partners [that] will lead to a finding of general affiliation" fails as unsubstantiated. In fact, one joint venture between two firms is not enough to support a finding of affiliation. *Size Appeal of DCT, Inc.*, SBA No. SIZ-4996 (2008). OHA has only found affiliation under this ground when there have been numerous contracts awarded to the joint venture in question. *See. e.g. Size Appeal of Robert M. Gomez & Assoc., Inc.*, SBA No. SIZ-3921 (1994); *Size Appeal of Team Contracting, Inc.*, SBA No. SIZ-3875 (1994). Where there is only one contract here, there is no support for finding SLI affiliated with NAS on such ground.

AR 13144. The OHA's analysis is sound. While 13 C.F.R. § 121.103(h) provides that a "longstanding inter-relationship or contractual dependence between the same joint venture partners will lead to a finding of general affiliation between and among them," there must be a significant number of joint ventures or contracts between the same parties for affiliation to arise. For example, in *Team Contracting, Inc.*, SBA No. 3875 (1994), general affiliation was found between joint venture partners where the joint venture had performed nineteen contracts. Likewise, in *Robert M. Gomez & Associates, Inc.*, SBA No. 3921 (1994), the joint venture received at least fourteen contracts. Yet, in *Size Appeal of Quality Servs. Int'l, LLC*, SBA No. SIZ-5599 (2014), the OHA found no error in the area office's determination that eight joint ventures formed between the same entities that had been awarded fifteen contracts did not rise to the level of general affiliation. Here, NAS bid on and was awarded one contract. ZIN Tech fails to point to any OHA case or SBA regulation that mandates a finding of general affiliation between SLI and BNI because they have formed one joint venture that has received one contract award.

In addition, ZIN Tech asserts that the OHA ignored evidence that NAS violated the "rule of two," where joint venture partners will be found affiliated when the joint venture submits an offer after two years from the date of the first award under 13 C.F.R. § 121.13(h). ZIN Tech alleged before the OHA that NAS was an ongoing concern intending to bid on the follow-on to its nearly decade-long and over $2.5 billion Air Force Test Operations Sustainment ("TOS") contract designated TOS II. AR 12966. ████████████. AR 12528-29. The OHA found that ZIN Tech's argument:

---

formed to compete for, and has performed on, only one contract. AR 12537.

is merely speculative and without supporting evidence of such an offer to support
it. There is no evidence of any second offer from NAS. Appellant's speculations as
to offers NAS could make are also irrelevant, as nothing had happened as of the
date to determine size.

AR 13144. ZIN Tech does not dispute that, as the OHA correctly observed, as of the date to
determine size, May 2, 2023, the joint venture had not submitted an offer after two years from
the date of first award. ECF No. 45 at 13 (citing AR 12528-529). ███████
███████, ZIN Tech has not shown any violation of the two-year rule or other longstanding
relationship that would render SLI and BNI affiliated on May 2, 2023. *See Size Appeal of
Precision Asset Mgmt. Corp. & Q Integrated Cos.*, SBA No. SIZ-5781 (2016) ("OHA has held in
a host of cases that events occurring after the date to determine size are not relevant in a size
determination.") (citations omitted). Thus, the OHA's finding that there was no longstanding
inter-relationship between NAS and SLI requiring a finding of general affiliation between the
joint venture partners was not arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law. *Precise Sys., Inc.*, 122 Fed. Cl. at 269.

### C. The OHA Did Not Commit Legal Error by Applying 13 C.F.R. § 121.103(h) to Calculate SLI's Employee Count and Finding that SLI is a Small Business.

ZIN Tech argues that the OHA erred in its interpretation of 13 C.F.R. § 121.103(h)
(2023), and instead the OHA should have relied on an interpretation from a previous version of
the regulation[30] that was discussed in a case before this court, *Swift & Staley, Inc. v. United
States*, 155 Fed. Cl. 630, 636 (2021). ZIN Tech cites 13 CFR 121.103(h), arguing that under this
regulation NAS should not be considered a proper joint venture because NAS is a *populated*
joint venture. ECF No. 45 at 19. Besides stating this allegation, ZIN Tech does not support its
argument. *See generally*, ECF No. 45. Although both NAS and HX5 Sierra are populated joint
ventures, it appears that ZIN Tech only takes issue with NAS' affiliation as a joint venture
partner.

The issue before the Court therefore is whether the OHA's interpretation of 13 C.F.R. §
121.103(h) to calculate a proportionate share of HX5 Sierra's and NAS's employees, both of
which are populated joint ventures, in SLI's total employee count was arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance with law. *Precise Sys., Inc.*, 122 Fed. Cl. at
269.

First, to determine whether the OHA's interpretation of 13 C.F.R. § 121.103(h) was an
error of law, the Court must review the OHA's decision. The OHA reviewed the Area Office's

---

[30] It is important to note at the outset that the applicable regulation to calculate the size of
a concern that is a partner to a joint venture are those that were in effect on May 2, 2023, the date
of SLI's initial offer and self-certification. *See* 13 C.F.R. § 121.404(a) (2023) ("SBA determines
the size status of a concern, including its affiliates, as of the date the concern submits a written
self-certification that it is small to the procuring activity as part of its initial offer or response
which includes price."); AR 12701, 13125.

size determination, which found that SLI is an eligible small business as its employee count does not exceed the 1,000-employee limitation. The Area Office examined SLI's relationship as a member of two populated joint ventures with HX5 Sierra and NAS and relying on *Swift and Staley, Inc.*, 155 Fed. Cl. at 636, found neither HX5 Sierra nor NAS is "a valid joint venture" because both are populated joint ventures. AR 12702 (citing *Size Appeal of Swift & Staley, Inc.*, SBA No. SIZ-6125 (2021) (remand)); *see Swift & Staley, Inc.*, 155 Fed. Cl. at 636 (holding that a business need not include its proportionate share of receipts from populated joint ventures when determining its individual size status). Accordingly, the Area Office conducted a general affiliation analysis between SLI and the two populated joint ventures, and the Area Office found that HX5 Sierra is affiliated with SLI and that SLI was not affiliated with NAS, and therefore aggregated the number of employees for SLI and its affiliate, HX5 Sierra. AR 12702. The Area Office concluded that SLI is a small business as its size does not exceed the 1,000-employee size standard. AR 12703-07.

While the OHA affirmed the Area Office's conclusion that SLI is an eligible small business, it did not agree with the Area Office's analysis and employee count calculation. The OHA held that although the Area Office's error was ultimately harmless, as the matter would reach the same result that SLI was a small business, the Area Office incorrectly relied on *Swift & Staley, Inc.*, 155 Fed. Cl. at 630.

In *Swift*, this Court held that the regulations in effect at the time of the plaintiff's self-certification, an affiliated joint venture did not meet the requirement of 13 C.F.R. § 121.103(h) that joint ventures "may not be populated," and, thus the affiliated joint venture did not qualify for treatment as a joint venture under Paragraph (h) and its subparagraphs. *Swift*, 155 Fed. Cl. at 635-36. This Court emphasized the language in the regulation, that "[*f*]*or the purposes of this provision* … a joint venture … *may not be populated* . . . ." *Swift & Staley, Inc.*, 155 Fed. Cl. at 636 (emphasis in original).

The OHA pointed out that after the *Swift and Staley* decision, the SBA revised the regulation and, as of the date of SLI's initial offer, the analysis in *Swift and Staley* no longer applies to the revised regulation, "'[f]or size purposes, a concern must include in its receipts its proportionate share of joint venture receipts (whether that joint venture is populated or unpopulated).'" AR 13124 (quoting 13 C.F.R § 121.103(h)(4)). The OHA continued by explaining that "[a]fter this regulatory revision, any size determination must include in the calculation of the concern's size, its proportionate share of the receipts or employees of any joint venture to which it is a partner, whether that joint venture is populated or unpopulated." AR 13125. The OHA further explained that the regulatory revision applies to the size determination because "[t]he applicable regulations are those in effect on the date to determine size." *Id.* (citing *Size Appeal of Rocky Mountain Medical Equipment*, LLC, SBA No. SIZ-6129 (2021)). The date of SLI's initial offer was May 2, 2023. *Id.* (citing 13 C.F.R. § 121.404(a)). Accordingly, the OHA concluded that the "regulations on that date were not the same regulations in effect on the date to determine size in the *Swift & Staley* cases, but those in place now as a result of the revisions of 2020 and 2022." *Id.* Given the date of the initial offer and the rule that the governing regulation is that which was in effect when the initial offer was submitted, the OHA explained that:

Therefore, on the date for determining size, SBA's regulations clearly required that a concern which was a partner to joint ventures include in its calculation of its number of employees or annual receipts its proportionate share of the employees or annual receipts of its joint ventures, whether they were populated (having their own employees) or unpopulated. A concern is not an affiliate of a joint venture of which it is a member. *Size Appeal of Barlovento, LLC*, SBA No. SIZ-5191 (2011); 87 Fed. Reg., at 381.

AR 13125-26. Given this, the OHA also found that "the Area Office thus erred in conducting a general affiliation analysis of HX5 Sierra and NAS, and concluding HX5 Sierra was affiliated with SLI, including all of its employees in the calculation of SLI's size and NAS was not an affiliate, excluding any of its employees in its calculation." AR 13126. Applying the revised regulation, the OHA reasoned that "SLI's size must be calculated by a number of employees of both HX5 [Sierra] and NAS equal to SLI's percentage ownership in each joint venture." *Id.* Accordingly, the OHA considered the record relating to the percentage of employees for each joint venture to which SLI is a partner:

> That is, based upon the record before the Area Office, ████████ of the employees of HX5 Sierra, and ████████ of the employees of NAS. The Employee Calculation Worksheet SLI submitted contains this information, as part of its calculation of its employees. A review of this shows that SLI's total number of employees under the correct calculations is well within the applicable size standard. Accordingly, I conclude the Area Office's error here was ultimately harmless, as the matter would reach the same result, that SLI was a small business. Size Appeal of OSG, Inc., SBA No. SIZ-5178, at 8 (2016). *Id.* Thus, the OHA affirmed the Area Office's Size Determination.

AR 12979. For the reasons given below, the Court holds that the OHA did not err in its analysis that the revised statute explains that a joint venture member submitting an offer for a small business contract should calculate a proportionate share of its affiliated joint venture employees, regardless of whether the affiliated joint ventures are populated or unpopulated, to its total employee count.

This Court construes a regulation in the same way as a statute. *Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346-47 (Fed. Cir. 2005) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414-15, 65 S. Ct. 1215, 89 L. Ed. 1700 (1945)). The Court's analysis of a regulation begins with the plain language of the regulation. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 459, 122 S. Ct. 941, 151 L. Ed. 2d 908 (2002) ("As in all statutory construction cases, we begin with the language of the statute."). The Court considers "the plain language of the regulation, the common meaning of the terms, and the text of the regulation both as a whole and in the context of its surrounding sections." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1316 (Fed. Cir. 2017). The Court turns to the plain language of the relevant regulations in effect when SLI submitted its self-certification on May 2, 2023. *See* 13 C.F.R. § 121.404(a); AR 3175. Section 121.103 provides in relevant part:

(h) Receipts/employees attributable to joint venture partners. For size purposes, a concern must include in its receipts its proportionate share of joint venture receipts (whether that joint venture is populated or unpopulated), unless the proportionate share already is accounted for in receipts rejecting transactions between the concern and its joint ventures (e.g., subcontracts from a joint venture entity to joint venture partners). In determining the number of employees, a concern must include in its total number of employees its proportionate share of joint venture employees (*whether the joint venture is populated or unpopulated*).

. . . .

A joint venture: Must be in writing; must do business under its own name and be identified as a joint venture in the System for Award Management (SAM) *for the award of a prime contract*; may be in the form of a formal or informal partnership or exist as a separate limited liability company or other separate legal entity; and, if it exists as a formal separate legal entity, may not be populated with individuals intended to perform contracts awarded to the joint venture (i.e., the joint venture may have its own separate employees to perform administrative functions, including one or more Facility Security Officer(s), but may not have its own separate employees to perform contracts awarded to the joint venture).

13 C.F.R. § 121.103(h) (in effect on May 2, 2023).

In the revised regulation, the SBA removed the "for the purposes of this provision" language, which was important to this Court's ruling in *Swift and Staley*, effective on November 16, 2020, as the language indicated to the Court that the definition of a joint venture applied to the entire provision, both for a joint venture submitting a bid for the prime contract and its joint venture partners. 85 Fed. Reg. 66146, 66148 (Oct. 16, 2020). SBA made further changes effective January 5, 2022, amending 13 C.F.R. § 121.103(h) to include language requiring that to calculate a concern's size, a concern must include in its count of receipts or employees its proportionate share of its joint venture receipts or employees, *whether the joint venture is populated or unpopulated*. 87 Fed. Reg. 380, 381 (Jan. 5, 2022) (emphasis added). The other crucial change in the regulation, is the addition of the language, "*for the award of a prime contract*" as it regards the definition of a joint venture. The addition of this language further shows that the definition of a joint venture in this provision is relevant as to the bidding entity for award of a prime contract and not for the definition of the prime contractor's joint venture partners.[31] Thus, the regulation in effect at the time of SLI's self-certification on May 2, 2023, was materially different from the regulation at issue in *Swift & Staley*.

---

[31] ZIN Tech argues in its Reply that the version of 13 C.F.R. § 121.103(h) in effect before, during and after SLI submitted its proposal has said a joint venture "may not be populated with individuals intended to perform contracts awarded to the joint venture." ECF No. 51 at 9. Although the language defining a "joint venture" is the same in both versions of the regulation, the revised regulation only applies the definition of "joint venture" to the bidding entity for the prime contract instead of applying the definition to the entire provision as it did in *Swift*. *See Swift & Staley, Inc.*, 155 Fed. Cl. at 636 (emphasis in original) (The Court emphasized the language in the regulation, that "[*f*]*or the purposes of this provision* … a joint venture . . . *may not be populated* . . . .").

Moreover, the SBA also clarified the meaning and purpose of 13 C.F.R. § 121.103(h) in the preamble to the revised regulation,

> It is well established that business concerns are not affiliates of joint ventures of which they are members for size purposes. … [s]ince 2004, SBA regulations have required a joint venture partner to include its proportionate share of joint venture receipts and employees in its receipts and employee count, respectively. . . . The final rule of October 16, 2020, revised § 121.103(h) to clarify how a joint venture partner must calculate its proportionate share of joint venture receipts and employees for purposes of determining its own size status. Specifically, the final rule provided that the joint venture partner must include its percentage share of joint venture receipts and employees in its own receipts or employees.
>
> …
>
> It has come to SBA's attention that some have misinterpreted the intent of the final rule. Specifically, because the regulations no longer allow joint ventures to be populated with individuals intended to perform small business set-aside contracts awarded to the joint venture, some have reasoned that a joint venture populated with its own separate contracting-performing employees does not qualify as a joint venture for all SBA program purposes. From this logic, it ostensibly follows that a joint venture partner need not include in its own receipts its proportionate share of receipts and employees from populated joint ventures. *This was not SBA's intent*.
>
> …
>
> *Nothing, however, in the final rule or the 2016 rulemaking signaled a change in policy concerning the treatment of receipts and employees from populated joint ventures for purposes of determining a joint venture partner's size. … [i]t is irrelevant whether the joint venture partner's proportionate share of receipts and employees are from populated or unpopulated joint ventures. Thus, while populated joint ventures are no longer eligible to submit offers for small business contracts, receipts and employees from populated joint ventures are still attributable to the underlying joint venture partners for size purposes.* This rule corrects the above misconception by clarifying that a concern must include in its receipts and employee count its proportionate share of joint venture receipts and joint venture employees, respectively, regardless of whether the joint venture is populated or unpopulated.

87 Fed. Reg., at 381 (emphasis added). Thus, it is clear that after the *Swift and Staley* case was decided, the SBA's revised regulation now supports the finding that a joint venture partner submitting an offer for a small business contract should calculate a proportionate share of its affiliated joint venture employees, regardless of whether the affiliated joint ventures are populated or unpopulated, to its total employee count. This Court agrees with the OHA's analysis of the revised regulation and holds that the applicable regulation clarifies the SBA's intent and unambiguously explains how a joint venture partner should calculate its receipts and

employees for size purposes.[32]  After this regulatory revision, any size determination must include in the calculation of the concern's size, its proportionate share of the receipts or employees of any joint venture to which it is a partner, whether that joint venture is populated or unpopulated.

Finally, ZIN Tech argues that the OHA erred in not finding general affiliation between SLI and HX5 Sierra or NAS and that this resulted in an improper size calculation.  ZIN Tech asserts that under the general principles of affiliation, the OHA should have also calculated the average total employees of each alleged affiliate.  *See* 13 C.F.R. § 121.103(a)(6); 13 C.F.R. § 121.106.  ZIN Tech concludes that if "the Agency had properly done so here, Sierra Lobo's ▮ employees plus HX5 Sierra's ▮ employees plus NAS's full average of ▮ employees would equal ▮ employees."  ECF No. 45 at 24-25.

Although ZIN Tech seems to argue that the OHA did not consider its arguments of general affiliation, for the reasons detailed in this opinion, this assertion fails.  *See supra* pp. 28-33.  The OHA addressed each argument that ZIN Tech properly brought before the OHA and considered whether the evidence would cause the joint venture partners to be found affiliated.  AR 13144 ("While Appellant raises arguments that might cause the partners to a joint venture to be found affiliated . . .").  The OHA's application of the joint venture affiliation regulation, 13 C.F.R. § 121.103(h), to calculate SLI's joint venture partner employees did not mean that the OHA disregarded the general principles of affiliation.  Because the OHA considered the evidence presented by ZIN Tech and found that SLI is a joint venture partner with HX5 Sierra and NAS, the OHA found that the general principles of affiliation do not apply, as "A concern is not an affiliate of a joint venture of which it is a member."  AR 13144, *Consolidation of Mentor Protégé Programs & Other Gov't Contracting Amends. Correction*, 87 Fed. Reg. 380-01, 381 (Jan. 5, 2022) ("It is well established that business concerns are not affiliates of joint ventures of which they are members for size purposes.").

Because all of ZIN Tech's allegations of general affiliation fail, as detailed in this opinion, and because HX5 Sierra and NAS are valid joint ventures, there is no basis for any general affiliation analysis between SLI and either HX5 Sierra or NAS.  Thus, it was proper for the OHA to apply 13 C.F.R. § 121.103(h) to calculate SLI's employee count.  Again, SLI was

---

[32] ZIN Tech also argues that the OHA's determination that *Swift & Staley* had been overturned is legal error.  ECF No. 45 at 16.  According to ZIN Tech, the OHA's application of the proportionate share of employees' provision is a "sweeping conclusion" that "writes out the rest of SBA's regulations concerning affiliation."  ECF No. 45 at 16.  This Court in *Swift & Staley* held that this provision applies to only unpopulated joint ventures.  155 Fed. Cl. at 636.  The SBA's regulatory revision did not overturn *Swift & Staley* but instead clarified that "[i]n determining the number of employees, a concern must include in its total number of employees its proportionate share of joint venture employees (*whether the joint venture is populated or unpopulated*)."  13 C.F.R. § 121.103(h) (emphasis added).  The OHA's determination that the interpretation of 13 C.F.R. § 121.103(h) in *Swift & Staley* no longer applies after the regulatory revisions did not, as ZIN Tech argues, render null "all other bases of affiliation."  ECF No. 45 at 16.  Rather, it clarified the specific regulation regarding how to calculate the joint venture employees of a joint venture partner submitting an offer for a small business contract.

the bidding entity, so the only question under 13 C.F.R. § 121.103(h) is what portion of HX5 Sierra's and NAS' employees are included in SLI's size calculation. ZIN Tech alleges, without any support, that in calculating SLI's size, "OHA should have also calculated the average total employees of each alleged affiliate." ECF No. 45 at 24. SLI is not generally affiliated with either HX5 Sierra or NAS. Accordingly, in calculating SLI's size, the relevant question is the number of SLI's employees, together with its proportionate share of joint venture employees. *See* 13 C.F.R. § 121.103(h). As confirmed by the OHA and the record, SLI, together with its proportionate share of employees of HX5 Sierra and NAS, is small under the applicable 1,000-employee size standard. AR 13126 (explaining a review of the employee calculation worksheet "shows that SLI's total number of employees under the correct calculations is well within the applicable size standard").

For the reasons given above, the Court holds that the OHA properly applied 13 C.F.R. § 121.103(h) and correctly found that SLI must include in its total number of employees the share of HX5 Sierra's and NAS' employees commensurate with its ownership in each entity, ██ and ██, respectively. AR 13126. Further, the OHA correctly found that "SLI's total number of employees under the correct calculations is well within the applicable size standard." AR 13144. Thus, this Court holds that the OHA's conclusion that SLI "is an eligible small business for the subject procurement" was not arbitrary, capricious, or contrary to law.[33] AR 13145.

## CONCLUSION

ZIN Tech has not established that NASA's evaluation was conducted in an irrational, arbitrary, or capricious manner, or that NASA's evaluation prejudiced ZIN Tech. Further, ZIN Tech has not shown that the OHA's decision affirming the Area Office's size determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Not having shown success on the merits, this Court need not consider the other injunctive factors. *See Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018) (holding that "proving success on the merits is a necessary element for a permanent injunction"). No relief is warranted. Accordingly, ZIN Tech's Motions for Judgment on the Administrative Record are **DENIED**. The Government's and Intervenor's Cross-Motions for Judgment on the Administrative Record are **GRANTED**. The Clerk of Court is directed to enter judgment for the Government. No costs.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge

---

[33] Further, ZIN Tech has offered no support for its assertion that SLI, a joint venture partner, could be affiliated under the general principles of affiliation with the joint venture itself. Even if ZIN Tech did allege this, the allegation would fail as "[i]t is well established that business concerns are not affiliates of joint ventures of which they are members for size purposes." 87 Fed. Reg. 380, 381 (Jan. 5, 2022); AR13126 ("A concern is not an affiliate of a joint venture.") (citing *Size Appeal of Barlovento, LLC*, SBA No. SIZ-5191 (2011)).